## THE STATE OF MARYLAND *vs.* LOUIS HYMAN.

*Police Power—Health Regulations—Act of Legislature Regulating Manner in Which Manufacture of Clothing May be Carried on in Dwelling-Houses—Validity and Construction of the Statute.*

It is a legitimate and important function of the State to make laws to preserve and protect the public health, morals and safety, and in regard to such laws the authority of the State is complete, unqualified and exclusive. This power can neither be limited by contract nor bartered away by legislation.

It is for the Legislature to determine whether particular acts or things are or are not dangerous to the public health or safety. And if a statute designed to protect the public health has a real and substantial relation to this power of the State, the Courts will not hold it to be void merely because it is, in their judgment, unreasonable and unwise.

But whenever power has been delegated by the Legislature to a municipal corporation to adopt ordinances for the protection of the public health or safety, the reasonableness of the measures enacted by the municipality is a feature to which the Courts look to see whether the measure is within the power granted; and they do this upon the assumption that the Legislature did not intend to empower the municipality to enact unreasonable or oppressive ordinances.

The Act of 1902, ch. 101, provides that no room in any tenement or dwelling-house shall be used for the manufacture of coats, vests, trousers, etc., except by the immediate members of the family living therein, and not by them until a permit shall have been obtained from the Chief of the Bureau of Industrial Statistics after an inspection of the premises, which permit shall state the maximum number of persons who may be employed therein, and may be revoked if the health of the community or of the persons living in such tenement requires it; that no person or corporation shall employ any person in making such wearing apparel in any room or building in the rear of a tenement or dwelling-house without first obtaining a permit stating the maximum number of persons allowed to be employed therein; that every person or corporation giving out materials to be made into clothing or employing persons for that purpose in any tenement for other building shall keep a register of the names and addresses of all persons to whom such work is given. Other sections of the law provide for the inspection of the places where such clothing is made. *Held,* that since the manufacture of wearing apparel in unsanitary and overcrowded rooms will promote the spread of, if it does not engender, disease, it is within the police power to regulate the number of persons, etc , who may be employed in any tenement where such manufacture is carried on; that the Act of 1902 has a real and substantial relation to the power of the State to protect the public health in this matter and is a legitimate exercise of this power, although some of its provisions if harshly administered may be oppressive.

*Held,* further, that the provision of the Act requiring a permit be to secured setting forth the number of persons who may be employed in each room is to be construed in connection with a section of Art. 27 of the Code, of which Article this Act is an amendment, which requires that at least 400 cubic feet of clear space shall be allowed in each room for each occupant in manufacturing establishments, and this regulation as to the permit is strictly a health regulation.

*Held,* further, that the provisions of the Act requiring a register to be kept of the names and addresses of persons to whom wearing apparel to be

made in tenements is given out is also a health regulation, because the inspector without the aid of such register would be unable to trace the localities where the work is being done.

*Held*, further, that the Act is intended to apply to tenements and other buildings where the garments specified are manufactured for sale, and it has no relation to homes or places where apparel not manufactured for sale may be made.

Appeal from the Criminal Court of Baltimore (STOCK-BRIDGE, J.)

The cause was argued before MCSHERRY, C. J., FOWLER, BRISCOE, PAGE, BOYD, PEARCE, SCHMUCKER and JONES, JJ.

*William S. Bryan, Jr., Attorney-General*, and *Jacob M. Moses*, for the appellant.

The controlling question in this case is the constitutional validity of ch. 101 of the Acts of 1902. It is respectfully maintained that the Act was well within the power of the Legislature, and that it does not conflict with any clause of either the State or the Federal Constitution.

" 'This police power of the State,' says an eminent Judge, 'extends to the protection of the lives, limbs, health, comfort and quiet of all persons, and the protection of property within the State, according to the maxim, *Sic utere tuo ut alienum non lædas*, which being of universal application, it must, of course, be within the range of legislative action to define the mode and manner in which every one may so use his own as not to injure others.' And again : By this 'general police power of the State, persons and property are subjected to all kinds of restraints and burdens, in order to secure the general comfort, health and prosperity of the State ; of the perfect right in the Legislature to do which, no question ever was, or upon acknowledged general principles, ever can be made, so far as natural persons are concerned.' And neither the power itself, nor the discretion to exercise it, as need may require, can be bargained away by the State." *Cooley on Constitutional Limitations* (6th ed.) 706; *Thorpe v. Rutland and B. R. R.*, 27

Vermont, 140, 149; *Barbier case*, 113 U. S. 31; *In re Rahrer*, 140 U. S. 554, 555; *State* v. *Schlenker*, 51 L. R. A. 347; *Deems* v. *Baltimore*, 80 Md. 173; *State* v. *Broadbelt*, 89 Md. 585; *Com.* v. *Alger*, 7 Cush. 84; *Lawton* v. *Steele*, 152 U. S. 133.

It is to be borne in mind that this police power—this power to legislate for the public health and public morals and public safety and public convenience, is confided to the discretion of the *legislative* branch of the State Government.

No matter whether the action of that co-ordinate branch of the government was, in the opinion of the Courts, just or unjust, wise or foolish, if the Courts can see that it had, "a real and substantial relation" to any one of the heads of the police power, they are not authorized to interfere, and to override and nullify the legislative will. *Lake Roland R. R. Co.* v. *Baltimore*, 77 Md. 380, 381; *Powell* v. *Pennsylvania*, 127 U. S. 684; *Mugler* v. *Kansas*, 123 U. S. 661, 662, 663; *Sprigg* v. *Garrett Park*, 89 Md. 406, 411; *Stevens* v. *State*, 89 Md. 674; *State* v. *Broadbelt*, 89 Md. 577; *State* v. *Knowles*, 90 Md. 646; *State* v. *Ashbrook*, 48 L. R. A. 269; *Chicago* v. *Netcher*, 48 L. R. A. 264.

Of course, every intendment is made by the Courts in favor of the constitutionality of a statute. The Court, unless the contrary is manifest, will presume that the Legislature acted within its constitutional limitations. *R. R.* v. *Matthews*, 174 U. S. 96; *Mugler* v. *Kansas*, 123 U. S. 661; *Powell* v. *Pennsylvania*, 127 U. S. 684; *Co. Com.* v. *Meekins*, 50 Md. 39, 40; *Baltimore* v. *State*, 15 Md. 453; *In re Ten Hour Law*, 61 L. R. A. 614; *Cooley on Constitutional Limitation*, 216.

Indeed, if one construction of which a statute is susceptible would make it valid, and another equally plausible construction would make the statute unconstitutional, the validating construction will be adopted by the Courts; for it will not be presumed that the Legislature intended to pass a void or unconstitutional statute. *Temmick* v. *Owings*, 70 Md. 251; *U. S.* v. *Combs*, 12 Peters, 76; *Hooper* v. *California*, 155 U. S. 657; *Broughton* v. *Pensacola*, 93 U. S. 269; *Gordon* v. *M. & C. C.*, 5 Gill, 241.

.As illustrating exertions of the police power by the Legislature, which have been upheld by the Court, see *Holden* v. *Hardy*, 165 U. S. 368; *In re Ten Hour Law*, 61 L. R. A. 612; *R. R.* v. *Paul*, 173 U. S. 404; *McDaniels* v. *Connelly*, 60 L. R. A. 947; *Wenham* v. *Nebraska*, 58 L. R. A. 825; *Utah* v. *Sopher*, 60 L. R. A. 468; *Detroit Railway* v. *Osborne*, 189 U. S. 383; *Knoxville Co.* v. *Harbison*, 183 U. S. 13, 21; *Harbison* v. *Knoxville Co.*, 103 Tenn. 421; *Williams* v. *Fears*, 179 U. S. 270, 2 L. R. A. 81; 148 Mass. 368; 70 Miss. 560; 20 L. R. A. 52; 44 Minnesota, 271; 54 Ala. 150; 18 L. R. A. 639; 41 L. R. A. 854; 56 L. R. A. 287; *St. Louis Con. Coal Co.* v. *Illinois*, 179 U. S. 203. It is within the province of the State to *entirely prohibit* the sale of cigarettes, after they have been taken from the original packages, where there is no discrimination against those imported from other States, and there is no reason to doubt that the Act was intended for the protection of the public health. *Austin* v. *Tennessee*, 179 U. S. 343. As further illustrating the extent of the police power, *Powell* v. *Penna.*, 127 U. S. 678; *Missouri* v. *Layton*, 62 L. R. A. 163; *Jones* v. *Cody*, 62 L. R. A. 160; *Tennessee* v. *Cook*, 62 L. R. A. 174; *Easton* v. *Covey*, 74 Md.; *Bostock* v. *Sams,* 95 Md. 400; *Police Coms.* v. *Wagner*, 93 Md. 191.

Can it be successfully contended that the prohibition of persons manufacturing garments in dwelling or tenement houses has "no relation" to the health of the public who may purchase the clothing so manufactured? Or of the unfortunate and frequently abject and ignorant workmen and workwomen who may be crowded in unhealthy numbers into living rooms to work? The Court will judicially know that the health of the community may be imperilled by the spread of disease through sweatshop garments. The Court will judicially know that the health of men and women and also of little children is sometimes undermined and destroyed by underpaid, underfed families crowding in unhealthy numbers in a single room, in which they eat and sleep and work in squalid misery.

That the Act confides to the Chief of the Bureau of Industrial Statistics the power to revoke the permit to members o

the same family to manufacture clothing in a dwelling or tene-
ment house "at any time the health of the community or those
employed or living therein may require it," without making
any provision for the review by a judicial tribunal of his find-
ings of fact or of law, is no objection to the constitutionality
of the law.

That there is no constitutional objection to permitting an
executive officer to decide finally and without appeal any
question either of law or of fact was held in *Reetz* v. *Michigan,*
188 U. S. 505.

Authorizing a State Board of Health to make rules for the
prevention of the spread of disease is not an unlawful delega-
tion of legislative power.    And a regulation requiring school
children to be vaccinated during a smallpox epidemic is not
invalid.    *Blue* v. *Bleach,* 155 Indiana, 121.    See also *Wood-
ruff* v. *N. Y. and N. E. R. R.,* 20 Atl. Rep. 17, 22; *Atlantic
Express Co.* v. *R. R.,* 18 L. R. A. 393; *R. R.* v. *Commission,*
116 U. S. 307.

For other instances of stringent exertions of the police
power, see 54 L. R. A. 467; 53 L. R. A. 165; 53 L. R. A.
315; 41 L. R. A. 181; 41 L. R. A. 177; 34 L. R. A. 279;
50 L. R. A. 473; 54 L. R. A. 785.

An Act which is within the police power of the State, *e. g.*
a statute requiring heavy license fees of peddlers, may be
oppressive without being unconstitutional.    *State* v. *Harring-
ton,* 68 Vermont, 622; s. c., 34 L. R. A. 100, 104.    "The
police power of a State extends beyond the protection of
health, peace, morals, education and good order.    It is the
power to govern men and things within the limits of its do-
main.    It comprehends all those general laws of internal reg-
ulation necessary to secure peace, good order, the health and
comfort of society and the regulation and protection of all
property within the State."    34 L. R. A. 101.

Any occupation comes within the range of the police power
which is such as to be naturally liable to create a nuisauce un-
less subjected to special regulations, whether it be so con-
ducted as in fact to create a nuisance or not.    *State* v. *Orr,* 34
L. R. A. 279.

. There has for many years been an ordinance in force in the city of Baltimore requiring, under a penalty, street car tracks to be repaired whenever "any part thereof shall, *in the opinion of the City Commissioner*, require repairing." *City Code of 1893*, Art. 41, sec. 12.

A milk inspector could by ordinance be given lawful authority to destroy (without opportunity to appeal or to have a review of his decision) milk which he found, on inspection, to be impure. *Deems* v. *Baltimore*, 80 Md. 164; See also *Boehm* v. *Baltimore*, 61 Md. 260.

Of course, if, before the Chief of the Bureau of Labor Statistics could revoke a permit to prevent the spread of disease, it were necessary that there should be a judicial investigation with the accompanying inevitable delays, the whole purpose of the revocation of the permit would be, in many instances, defeated.

. The spread of disease occasioned by the continued operation of the sweat shop might be accomplished, while the Court was hearing evidence and determining whether any preventive measures should be taken.

It is respectfully submitted that while it is very possible that the Chief of the Bureau of Labor Statistics might render himself liable civilly or criminally, or both; if he arbitrarily and corruptly or maliciously revoked a permit without any reasonable ground for believing that there was any lawful occasion for doing so ; or that even an injunction might be obtained on showing such facts, nullifying such corrupt and maliciously given order of revocation—although the legal propriety of the issuance of such an injunction, in any event, is very much doubted—the fact that it is conceivable that the power may at some time be abused is no ground for holding invalid this statute passed for the salutary purpose of mitigating the evils flowing from the manufacture of sweat shop clothing. *Bevard* v. *Hoffman*, 18 Md. 479; *Friend* v. *Hamill*, 34 Md. 304; *Elbin* v. *Wilson*, 33 Md. 142; *Hardesty* v. *Taft*, 23 Md. 530; *Baltimore* v. *O'Neill*, 63 Md. 344; *O'Neill* v. *Register*, 75 Md. 425; *Knell* v. *Briscoe*, 49 Md. 414; *State* v. *Carrick*, 70 Md. 586; *Roth* v. *Shupp*, 94 Md. 55.

The right of the Legislature to adopt stringent measures to stamp out the evils incident to the unregulated manufacture of clothing in sweat shops can not, however, in any way depend upon the inquiry whether there is or not, any civil or criminal remedy against the executive officer for the malicious or corrupt abuse of the power given him.

*Myer Rosenbush* and *Foutz & Norris* for the appellee, submitted the case on their brief.

The liberty mentioned in the Fourteenth Amendment to the Federal Constitution means not only the right of the citizen to be free from the mere physical restraint of his person, as by incarceration, but the term is deemed to embrace the right of the citizen to be free in the enjoyment of all his faculties, to be free to use them in all lawful ways, to live and work where he will, to earn his livelihood by any lawful calling, to pursue any livelihood or avocation, and for that purpose to enter into all contracts which may be necessary and essential to his carrying out to a successful conclusion the purposes above mentioned. *Allgeyer* v. *Louisiana*, 165 U. S. 589; *In re Jacobs*, 98 N. Y. 98; *People* v. *Marx*, 99 N. Y. 387; *Long* v. *State*, 74 Md. 565; *Luman* v. *Hutchins*, 90 Md. 25; *Singer* v. *State*, 72 Md. 464; *State* v. *Broadbelt*, 89 Md. 565; *Butchers Co.* v. *Crescent City Co.*, 111 U. S. 746; *Lawton* v. *Steele*, 152 U. S. 136–8; *In re Sing Lee*, 96 Cal. 354; *In re Hong Wah*, 82 Fed. Rep. 623; *Bailey* v. *People*, 190 Ill. 37; *Ritchie* v. *People*, 155 Ill. 98; *Tiedeman, S. & F. Control*, secs. 120–147.

The Act absolutely prohibits the manufacture of any of the enumerated articles by *anybody*, unless a permit is first obtained; and under what circumstances may a permit be demanded as a matter of right by a citizen from the Chief of the Bureau of Industrial Statistics? The Act utterly fails to provide any standard or regulations which are to govern the citizen in the manufacture of the articles enumerated, or, the said chief in the issuance, withholding or revoking of the permit, except *the judgment* of the said Chief of the Bureau of Industrial Statistics, in other words, none of the enumerated articles

may be manufactured in any house in this State, even when they are for the *use of the family alone,* unless a permit is first had and obtained from said chief, whose power to issue or withhold the permit is absolutely uncontrolled by anything contained in the act itself.

(2) Only a husband, wife, their children or the children of either, under the provisions of the Act, may manufacture any of the articles enumerated, *after having obtained a permit,* all others are expressly excluded, the parents of a husband or wife, the brothers and sisters of a husband or wife and all collateral relatives of either living in the same house or visiting there are *absolutely prohibited* from the manufacture of any of the enumerated articles, *even though they are intended for their own* personal use, or the use of the husband, wife, or *their children or the children of either.*

(3) The employment of a seamstress in any home in the State for the manufacture of any of the enumerated articles is absolutely prohibited by the Act.

(4) If a husband's wife be an invalid, and his children too young to make their own garments, he must either purchase or have them made outside his home, under the prohibition of the Act, no relative can make them for him in his home, nor can he employ *anyone* else to come to his home and make them.

(1) Chewing and smoking tobacco, candy and other articles of like nature, not being under the ban of the Act, may be made in tenements or dwelling-houses.

(2) The Act does not prohibit the manufacture of ladies' skirts, although ladies' waists come under the ban of the Act, presenting the anomaly of allowing the manufacture of that portion of a woman's dress called skirts, *anywhere,* but prohibiting the manufacture of that portion of a woman's dress called waist, except under the conditions prescribed by the Act.

The manufacture of the articles enumerated, is not only a lawful calling, but is universally known to be a necessary and useful occupation, and it is a matter of common knowledge, that its prosecution under ordinary conditions is not injurious

to the health of the public, or those engaged in it, and an Act which arbitrarily prohibits their manufacture even *under the most favorable sanitary conditions* is an unjust and unlawful discrimination in restraint of trade.     *City of Chicago* v. *Nechter*, 183 Ill. 104; *Le Blanc* v. *Mayor, etc.*, 106 La. 680; *Long* v. *State*, 74 Md. 572; *City of Denver* v. *Back*, 26 Colo. 530; *State* v. *Granneman*, 132 Mo. 326; *Ex-parte Leo Gentzseh*, 112 Cal. 468; *Eden* v. *People*, 161 Ill. 296; *In re Fee Toy*, 26 Fed. Rep. 611; *In re Sam Kee*, 31 Fed. Rep. 680; *City of Janesville* v. *Carpenter*, 77 Wis. 298; *In re Sing Too Quau*, 43 Fed. Rep. 359; *Ex-parte Patterson* (*Texas*), 51 L. R. A. 654; *Bailey* v. *People*, 190 Ill. 28; *Noel* v. *People*, 187 Ill. 587.

It may be argued by the State that the preceding sections of the sub-title of the article under which this act has been placed, furnish the necessary rules or standard by which the chief is to be governed in his inspections ; the only regulation (exclusive of those which apply to factories, manufacturing establishments, and workshops, which have no application here, as the Act of 1902, specifically alludes to tenements and dwelling-houses) is in relation to the number of cubic feet, and if that were intended, how easy it would have been for the Legislature to have said that the preceding legislation shall apply to tenements and dwelling-houses, instead of framing entirely new legislation.    The Act is, and was intended to be, applicable to entirely separate and distinct conditions from any other, is complete in itself, and should be so construed ; it must stand or fall upon its own strength or weakness, and the mere fact that it is found in that particular company, is no standard for construction ; it had to be placed somewhere ; but "very little reliance can be placed upon the heading under which it may be found." *State* v. *Popp*, 45 Md. 432; *Dundalk Co.* v. *Smith*, 97 Md. 177.

The Act deprives the citizen of his property, without due process of law, in that he is prevented from using the same in the prosecution of a lawful trade or occupation, in a lawful manner, when the same is not a menace to the public health, and where it is not used for purposes dangerous to the public safety or morals.

The provisions of the Act are unjust and unreasonable, oppressive and burdensome, arbitrary and unnecessary for the public welfare, and although by the enacting clause, its object might be supposed to be the preservation of the public health, the Act itself prescribes no conditions as to cleanliness, no regulations as to sanitation, no rules to control the issuance of the permit which is a pre-requisite to the making of any of the enumerated articles *by anybody*. And the entire question of proper sanitary conditions is left for determination of the Chief of the Bureau of Industrial Statistics, without prescribing any rules or standard for his guidance or control in granting or refusing permits, or the revoking of the permits which may be granted.

A permit is not to be granted by the Chief of the Bureau until after an inspection of the premises has been made. Neither the Chief of the Bureau of Industrial Statistics nor his assistant are required to be sanitary experts by the Act of 1902, or any prior legislation. A college president or a coal heaver, a ward politician or a bank clerk may be appointed to these positions, and there is nothing in the Act to prohibit it, nor is anything contained in the act creating that bureau (1892, ch. 29) requiring it.

The houses of the thousands of our citizens who are employed in the manufacture of the various articles enumerated in the Act, are opened by the Act of 1902 for the purpose of inspection.

As to the character and extent of that inspection ; as to the conditions that should obtain before a permit is issued, *the act is absolutely silent.*

As to the requirements necessary for the safety of the health of the community or those employed or living in any room or apartment in any tenement or dwelling-house, the violation of which will cause a revocation of a permit already granted, again the Act is silent, the only provision as to the revocation of a permit already granted, being, "such permit may be revoked by said Chief of the Bureau of Industrial Statistics at any time the health of the community or those employed or living therein may require it."

Absolutely no conditions are laid down by the Act with which these thousands of our people must comply before they can pursue the occupation by which they earn their livelihood and support those dependent upon them ; as to those working in their homes, no requirements are mentioned, no standard is provided, their right to pursue their usual vocations, lawful in itself, in a lawful manner in their own homes, is left solely and entirely to the arbitrary determination of the Chief of the Bureau of Industrial Statistics, without any rules to guide or control his action, or by which the uniform and impartial exercise of his power may be secured, this right to earn their livelihood is subject to the undirected and uncontrolled power of this Chief of the Bureau, and placed at the risk of his incapacity, favoritism, caprice and oppression, so far as any restraint is to be found in the Act, he gives, refuses and revokes the permits as he pleases.  "A statute which clothes a single individual with such power, hardly falls within the domain of law."  *Mayor* v. *Radeke*, 49 Md. 235; *Yick Wo* v. *Hopkins*, 118 U. S. 372; *Noel* v. *People*, 187 Ill. 589; *Schlaezlin* v. *Cabannis*, 135 Cal. 466; *Bostock* v. *Sams*, 95 Md. 400; *In re Jacobs*, 98 N. Y. 98.

The constitutionality of a law is to be tested not by what has been done under it, but by what may by its authority be done. *Ullman* v. *Mayor & C. C.*, 72 Md. 587.

It would be difficult, if not impossible, to crowd into so short a statute any more or greater violations of that principle so essential to a free government, of equal, general and standing laws.  *City of Janesville* v. *Carpenter*, 77 Wis. 303.

The Act is void as a whole, all its substantial provisions are so related to and dependent upon each other that the Legislature could have but one main object or system in view, and without the provisions which are invalid the Act would not have been passed.

If a statute attempts to accomplish two or more objects and is void as to one, it may still be in every respect complete and valid as to the other.  But if its purpose is to accomplish a single object only and some of its provisions are void, the

whole must fail unless sufficient remains to effect the object without the aid of the invalid portion, and if they are so mutually connected with and dependent on each other as conditions, considerations or compensations for each other as to warrant the belief that the Legislature intended them as a whole, and if all could not be carried into effect, the Legislature would not pass the residue independently, then if some parts are unconstitutional all must fail. *Cooley Const. Lim.*, 6 ed., p. 211.

In *Commonwealth* v. *Perry*, 155 Mass. 121, the Court said: "The manufacture of cloth is an important industry * * * there is no reason why men should not be engaged in it * * * the right to employ weavers, and to make proper contracts with them, is therefore protected by our Constitution; and a statute which forbids the making of such contracts, or to nullify them, or impair the obligations of them, violates fundamental principles of right which are expressly recognized in our Constitution." See *Godcharles* v. *Wigman*, 113 Pa. St. 431; *State* v. *Goodwill*, 33 W. Va. 179; *State* v. *Loomis*, 115 Mo. 307; *People Ex. Rel. Rodgers* v. *Coler*, 166 N. Y. 14; *People Ex. Rel. Treat* v. *Coler*, 166 N. Y. 146.

It is true that, in order to secure and promote the public welfare, the State creates Boards of Health, as an instrumentality or agency *for the purpose*, and invests them with the power to adopt ordinances, by-laws, rules and regulations necessary to secure the objects of its organization. While it is true that the character or nature of such boards is administrative only still, the powers conferred upon them by the Legislature, in view of the great public interest confided to them, have always received from the Courts a liberal construction; and the rights of the Legislature to confer upon them the power to make *reasonable rules*, by-laws and regulations, is generally recognized by the authorities.

When these boards duly adopt rules or by-laws by virtue of legislative authority, such rules or by-laws, within the respective jurisdictions, have the force and effect of a law of the Legislature. It is true that such laws or regulations *must be*

*reasonable*, and Boards of Health cannot enlarge or vary, by operation of such rules, the powers conferred upon them by the Legislature, and any rule or by-law which is in conflict with the State's organic law, or opposed to the fundamental principles of justice would be invalid.

Such measures must have some relation to the end in view, for, under the guise of the police power, personal rights and those pertaining to private property will not be permitted to be arbitrarily invaded by the legislative department. If the Legislature, in the interest of public health, enacts a law, and thereby interferes with the personal rights of an individual, destroys or impairs his liberty or property, it then, under such circumstances, becomes the duty of the Courts to review such legislation, and determine whether it in reality relates to, and is appropriate to secure, the object in view, and in such an examination the Court will look to the substance of the thing involved, and will not be controlled by mere forms. *Blue* v. *Beach*, 155 Ind. 121; *State* v. *Burdge*, 95 Wis. 390; *State* v. *Julow*, 129 Mo. 163; *Matter of Pell*, 171 N. Y. 48–51; *Cotton* v. *Kansas City*, 183 U. S. 79–93; *Cleveland* v. *Clemen & Bro.*, (Ohio 1903), 65 N. E. Rp. 885; *Street* v. *Varney*, (Ind. 1903), 66 N. E. Rep. 895; *People* v. *Orange, etc.*, (N. Y. Ct. App. April 28th, 1903.)

McSHERRY, C. J., delivered the opinion of the Court.

This is an appeal by the State of Maryland from the Criminal Court of Baltimore City. It is a case wherein Louis Hyman was indicted for a violation of the Act of 1902, ch. 101. The title of that Act is in these words: "An Act to add four additional sections to Article 27 of the Code of Public General Laws, title, 'Crimes and Punishments,' sub-title, 'Health, Workshops and Factories, Sweating System,' as the same was amended by ch. 302 of the Acts of 1894, and ch. 467 of the Acts of 1896; said four additional sections to be known respectively as sections 149EE, 149FF, 149GG, 149HH, and to come in immediately after section 149D of the Article." The indictment contains five counts. The first count charges

that the appellee, Hyman, unlawfully did use and cause to be used a certain room and apartment in a certain tenement and dwelling-house by other than the immediate members of the family then living therein for the manufacture of coats, vests, trousers, etc., contrary to the provisions of the above-mentioned Act of Assembly. The second count charges that the appellee, Hyman, did unlawfully use a certain room and apartment in a certain tenement and dwelling-house for the manufacture of coats, vests, trousers, etc., he, the said Hyman, not being then and there an immediate member of the family then living in said room and apartment contrary to the form of the aforesaid Act of Assembly, etc. The third count alleges that the appellee, Hyman, being then and there a part of the family unlawfully did use a certain room and apartment in a certain tenement and dwelling-house for the manufacture of coats, vests, trousers, etc., not having first obtained a permit from the Chief of the Bureau of Industrial Statistics stating the number of persons allowed to be employed therein, contrary to the said statute. The fourth count charges that the appellee, Hyman, in a certain room and apartment in a certain rear building in the rear of a tenement and dwelling-house unlawfully did work at and hire and employ divers persons to work at making coats, vests, trousers, etc., without first obtaining a written permit from the Chief of the Bureau of Industrial Statistics stating the maximum number of persons allowed to be employed therein contrary to the provisions of the statute, etc. And the fifth count charges that the appellee, Hyman, employing divers persons in a certain tenement and dwelling-house to make and wholly and partially finish coats, vests, trousers, etc., failed to keep a register of the names and addresses of all persons to whom such work was given to be made, contrary to the form of the Act of Assembly, etc. To this indictment, and to each count thereof, the appellee interposed a demurrer and upon hearing the demurrer was sustained, the indictment was on motion quashed and the traverser was discharged. Thereupon the State took this appeal.

The question which is thus presented is one not only of im-

portance but of considerable interest and when reduced to its final analysis, it is whether the Act under which the indictment was framed is a constitutional exercise of the legislative power of the General Assembly. To determine that question it will be necessary to briefly summarize the provisions of that statute.

It will be observed at the outset that the Act is ostensibly one intended for the preservation and the protection of the public health and safety. It is incorporated in the Code under the sub-title "Health" and its provisions were designed to promote the public health and welfare. By sec. 149EE, it is in substance provided that no room or apartment in any tenement or dwelling-house shall be used except by the immediate members of the family living therein, which shall be limited to husband and wife, their children, or the children of either, for the manufacture of coats, vests, trousers, etc. That no room or apartment in any tenement or dwelling-house shall be so used by any family or part of a family until a permit shall first have been obtained from the Chief of the Bureau of Industrial Statistics stating the maximum number of persons allowed to be employed therein. Such permit shall not be granted until an inspection of the premises has been made by the inspector or his assistant named by the Chief of the Bureau of Industrial Statistics and such permit may be revoked by the said Chief of the Bureau of Industrial Statistics at any time the health of the community or those employed or living therein may require it. That no person, firm, or corporation shall work or hire or employ any person to work in a room or apartment in any building, rear building, or building in the rear of a tenement or dwelling-house, at making in whole or in part any of the articles of wearing apparel mentioned above, without first obtaining a written permit from the Chief of the Bureau of Industrial Statistics stating a maximum number of persons allowed to be employed therein. That the said permit shall be posted in a conspicuous place in the room, or one of the rooms to which it relates. That every person, firm or corporation, contracting for the manufacture of any of the articles

mentioned above or giving out the incomplete materials from which they or any of them are to be made, or to be wholly or partially finished, or employing persons in any tenement or dwelling-house or other building to make wholly or partially finish the articles above mentioned shall keep a written register of the names and addresses of all persons to whom such work is given to be made or with whom they may have contracted to do the same. By sec. 149FF, it is provided that the Chief of the Bureau of Industrial Statistics or his assistant or any inspector shall have authority to enter any room, factory or place where any goods are manufactured into wearing apparel, for the purpose of inspection. And that the person, firm or corporation owning or controlling or managing such places shall furnish access to, or information in regard to, such places to the said Chief of the Bureau of Industrial Statistics or his deputies at any and all reasonable times while work is being carried on. By sec. 149GG, it is provided that the Chief of the Bureau of Industrial Statistics shall appoint two deputies and assistants whose duties it shall be to make such inspection of the tenements and dwelling-houses, factories, work shops, mills and such other places as he may designate. By sec. 149HH, it is declared that every person, firm or corporation, who shall in any manner violate the provisions of the preceding sections and who shall refuse to give such information and access to the Chief of the Bureau of Industrial Statistics or his deputies, or who shall fail to secure such permit as provided, shall, upon conviction, in any Court of competent jurisdiction be fined or imprisoned or both as in said section prescribed.

It is insisted by the appellee, and we presume that it was held by the Court below, that these provisions of the statute were unconstitutional and, therefore, void, because they were arbitrary and unreasonable. It is obvious that the statute was passed in furtherance of the protection of the health of the community. Its enactment was an exercise by the General Assembly of the police power of the State. What is and what is not within the limits of the police power has been a source of prolific discussion both in the Federal and in the State

Courts.   One of the legitimate and most important functions
of civil government is acknowledged to be that of providing
for the welfare of the people by making and enforcing laws to
preserve and promote the public health, the public morals,
and the public safety.   Civil society can not exist without
such laws and they are therefore justified by necessity and
sanctioned by the right of self-preservation.   The power to
enact and enforce them is lodged by the people with the gov-
ernment of the State, qualified only by such conditions as to
the manner of its exercise as are necessary to secure the indi-
vidual citizen from unjust and arbitrary interference.   With
respect to its internal police, the authority of each of the States
is supreme and exclusive.   Whilst by the Federal Constitu-
tion the separate and independent States surrendered or trans-
ferred to the General Government which they established,
such powers as were deemed to be necessary to enable it to
provide for the common defense and to promote the general
welfare of the people of the United States; the States them-
selves reserved complete and sovereign control over their own
internal affairs.   Accordingly the Supreme Court, has stated,
as an "impregnable position" that the States of the Union
have the same undeniable and unlimited jurisdiction over all
persons and things within their respective territorial limits as
any foreign nation has, where that jurisdiction is not surren-
dered or restrained by the Federal Constitution; and that by
virtue of this, it is not only the right, but the bounden and
solemn duty of the State to advance the safety, happiness and
prosperity of its people, to provide for their general welfare by
any and every act of legislation, which may be deemed to be
conducive to these ends; and that all these powers which re-
late to merely municipal legislation, or what may properly be
called, internal police are not surrendered or restricted; and
that, consequently, in relation to these the authority of a State
is complete, unqualified and exclusive; and, finally, that
amongst these powers are inspection laws, quarantine laws,
health laws of every description as well as laws for regulating
internal commerce of the State and to prevent the introduc-

tion or enforce the removal of prohibited articles of commerce. *City of New York* v. *Miln*, 11 Peters, 102. Every holder of property, said CHIEF JUSTICE SHAW in *Commonwealth* v. *Alger*, 7 Cush. 84, "however absolute and unqualified may be his title holds it under the implied liability that his use of it may be so regulated that it shall not be injurious to the equal enjoyment of others having an equal right to the enjoyment of their property nor injurious to the rights of the community. Rights of property, like all other social and conventional rights are subject to such reasonable limitations in their enjoyment as will prevent them from being injurious, and to such reasonable restraints and regulations established by law as the Legislature under the governing and controlling power vested in them by the Constitution may think necessary and expedient." This power said the Supreme Court in *Holden* v. *Hardy*, 169 U. S. 366, legitimately exercised can neither be limited by contract nor bartered away by legislation; or, as said by the same Court in *Stone* v. *Miss.*, 101 U. S. 816, no Legislature can bargain away the public health or the public morals. The people themselves cannot do it much less their servants. Government is organized with the view of their preservation, and cannot divest itself of the power to provide for them. And so again in *N. O. Gas Light Co.* v. *La. Light Co.*, 115 U. S. 650, it was said the constitutional prohibition upon State laws impairing the obligation of contracts does not restrict the power of the State to protect the public health and public morals nor the public safety as the one or the other may be involved in the execution of such contract. The exercise of the police power being for the promotion of the public good is superior to all considerations of private right or interest, and by virtue of it the State may lawfully impose upon the exercise of private rights such burdens and restraints as may be necessary and proper to secure the general health and safety. *P. & W. on Public Health and Safety*, sec. 12. The holder of property is bound to know that through agencies other than his own his property may become an occasion of injury to the public and that in such event it is subject to reasonable regu-

lation in the interest of the public. "Any other doctrine would strike at the root of all police regulations" *Id.* In the case of the *State* v. *Broadbelt*, 89 Md. 565, this Court had occasion to go into an examination of the police power of the State in reference to regulations respecting dairies and we need not repeat what was there so recently said with reference to the extent of the police power of the commonwealth. That the power is broad, comprehensive and far reaching will not be questioned or gainsaid. In the very nature of the case it must be so. It is, as said by MR. CHIEF JUSTICE TANEY, in the *License Cases,* 5 How. 583, "the power of sovereignty, the power to govern men and things within the limits of its dominion." It is a power that necessarily belongs to the legislative department of the State government. It is for that co-ordinate branch to determine whether particular things or acts are or are not dangerous to the public health, the public safety, and the public morals and when that branch of the government has spoken the subject must be considered as closed, unless the judicial department has a revisory jurisdiction; and that brings us to the question whether the Courts have such a jurisdiction and if they have what are its legitimate limits?

This inquiry presents the pivotal point of the case. It may be said in the language of the Supreme Court in *Mugler* v. *Kansas,* 123 U. S. 625, "if a statute purporting to have been enacted to protect the public health, the public morals or the public safety, has *no real or substantial relation to those objects* or is a palpable invasion of rights secured by the fundamental law, it is the duty of the Court to so adjudge and thereby give effect to the Constitution." Running through all the cases, both Federal and State, is the doctrine that if the measure designed for, or purporting to concern, the protection or preservation of the public health, morals or safety, is one which has a *real and substantial relation to the police power,* then no matter how unreasonable nor how unwise the measure itself may be, it is not for the judicial tribunals to avoid or vacate it upon those grounds. Numerous illustrations of this principle are furnished in reported cases. "For it must

now be considered as an established principle of law in this country, that there are no limits whatever to the legislative powers of the States, except such as are prescribed in their own Constitutions or in that of the United States; consequently, that the Courts, in the performance of their duty to confine the legislative department within the constitutional limits of its power, cannot nullify and avoid a law, simply because it conflicts with the judicial notions of natural rights or morality or abstract justice." *Parker & Worth Pub. H. & Saf.*, sec. 8, and cases cited in note 2. We may also refer to *Deems* v. *Baltimore*, 80 Md. 173, where an ordinance provided that if milk failed, when inspected by one of the local milk inspectors, to be of a certain quality it should be summarily seized and forfeited; and this Court held that the ordinance was a legitimate exercise of the police power though it involved the destruction of property without judicial procedure. In *Holden* v. *Hardy, supra,* a statute of the State of Utah limiting hours of labor in mines was held valid as an exercise of the police power. In *Railroad Co.* v. *Paul,* 173 U. S. 404, a statute requiring immediate payment of wages to discharged employees was held to be valid. In *Detroit Railway* v. *Osborne,* 189 U. S. 383, it was held that restrictions placed upon electrical cars and not upon other vehicles used on the public streets was a legitimate exercise of the police power. A striking illustration of what may be done, and validly done, under the police power is furnished in the case of the *Boston Beer Co.* v. *Mass.,* 97 U. S. 25. The Boston Beer Company was incorporated by the Legislature of Massachusetts in 1828, for the purpose of manufacturing malt liquors in all their varieties. In 1869, the Prohibitory Liquor Law of Massachusetts was passed. Under the last-named Act a citation was issued requiring the Boston Beer Company to appear in the Municipal Court of Boston and show cause why the liquors in its possession should not be forfeited. The Beer Company appeared and the trial resulted in a judgment of forfeiture. An appeal was taken to the Superior Court where judgment was again rendered for the Commonwealth;

whereupon the record was transmitted to the Supreme Judicial Court of the State which affirmed the action of the Superior Court and remanded the case to the latter Court where final judgment was entered declaring the liquors forfeited. To that judgment a writ of error was prosecuted and the proceedings thus reached the Supreme Court of the United States. In the last-named tribunal the judgment of the State Court was affirmed. In the course of the opinion reported in 97 *U. S.*, it was said: "The plaintiff in error was incorporated 'for the purpose of manufacturing malt liquors in all their varieties,' it is true; and the right to manufacture, undoubtedly, as the plaintiff's counsel contends, included the incidental right to dispose of the liquors manufactured. But although this right or capacity was thus granted in the most unqualified form, it cannot be construed as conferring any greater or more sacred right than any citizen had to manufacture malt liquor; nor as exempting the corporation from any control therein to which a citizen would be subject, if the interests of the community should require it. If the public safety or the public morals require the discontinuance of any manufacture or traffic, the hand of the Legislature cannot be stayed from providing for its discontinuance, by any incidental inconvenience which individuals or corporations may suffer. All rights are held subject to the police power of the State." Following the same current of decision is the case of *Kidd* v. *Pearson*, 128 U. S. 1. It was there said in dealing with a law of Iowa which authorized the abating as a nuisance of a distillery used for the unlawful manufacture and sale of intoxicating liquors, that "a State has the right to prohibit or restrict the manufacture of intoxicating liquors within her limits; to prohibit all sale and traffic in them in said State; to inflict penalties for such manufacture and sale; and to provide regulations for the abatement as a common nuisance of the property used for such forbidden purposes; and that such legislation by a State is a clear exercise of her undisputed police power, which does not abridge the liberties or immunities of citizens of the United States, nor deprive any person

of property without due process of law, nor in any way contravene any provision of the Fourteenth Amendment of the Constitution of the United States." See also *Austin* v. *Tenn.*, 179 U. S. 343; where a statute prohibiting the sale of cigarettes after they had been taken from the original packages was upheld as within the police power. See also *vol. 9, Rose's Notes to United States Reports*, 524–525.

There is a class of cases which must be distinguished from those which hold that the unreasonableness of a police regulation adopted by the Legislature furnishes no ground for the Courts to strike it down. The distinction is plain and simple. The Legislature being the sole depository of the law making power, it is not for Courts of justice to say that a given enactment passed in virtue of the police power, and having a direct relation to it, is void for unreasonableness, because if Courts undertook to exercise such an authority they would in effect exert a veto on legislation. But whenever power has been delegated by the Legislature to a municipal corporation to adopt and promulgate ordinances for the protection of the public health, morals or safety, the *reasonableness* of the measures enacted by the municipality is a feature to which the Courts look to see whether the measure is within the power granted ; and they do this upon the assumption that the Legislature did not intend to empower the municipality to enact unreasonable or oppressive ordinances. Thus in *Radecke's case*, 49 Md. 229, where an ordinance of Baltimore City, which permitted the Mayor to revoke any license previously granted to erect a steam engine, was under review, this Court said after alluding to quite a number of cases : "While we may not be willing to adopt and follow many of these cases, and while we hold that this power of control by the Courts is one to be most cautiously exercised, we are yet of opinion there may be a case in which an ordinance passed under grants of power like those we have cited, is so clearly unreasonable, so arbitrary, oppressive or partial, as to raise the presumption that the Legislature never intended to confer the power to pass it, and to justify the Courts in interfering and

setting it aside as a plain abuse of authority. In applying the doctrine of judicial control to this extent, we contravene no decisions in our own State and impose no unneccessary restraints upon the action of municipal bodies." The ordinance was set aside as a plain abuse of the authority delegated by the Legislature to the municipality. But when dealing with an Act of Assembly on this subject we have no such situation to confront us. If the Act has a real and substantial relation to the police power no inquiry as to its unreasonableness can arise, because it is the judgment of the law-makers and not of the Courts which must control ; and if in the judgment of the former the thing be reasonable, all inquiry on that ground by the latter is foreclosed.

Tested by the principles hereinbefore announced we find nothing in the Act of 1902 which indicates that its design, its purpose or its details have not a real and substantial relation to the police power. It may be conceded that some of these provisions, if harshly administered may be or become oppressive, but it by no means follows that the law itself is therefore not a legitimate exercise of the police power. It is not to be assumed that the public functionary will act in an oppressive or unlawful manner. Discretion must be reposed somewhere. If an official should transcend the legitimate limits of the authority with which the statute clothes him, the injured party is not without redress. Laws are to be upheld rather than stricken down. Every intendment must be made by the Courts in favor of the constitutionality of a statute. *County Commissioners* v. *Meekins,* 50 Md. 39; *Cooley, Com. Lim.,* 216. It is a cardinal rule that where one construction of the statute would make it valid and another would make it unconstitutional, Courts will follow the former rather than the latter interpretation, for the reason that it will not be presumed the Legislature intended to pass an invalid Act. *Temmick* v. *Owings,* 70 Md. 251; *Gordon* v. *M. & C. C.,* 5 Gill, 241.

Taking now in detail the five counts of the indictment, it is clear, we think, that the first count contains an allegation that the appellee was violating the health regulation prescribed by

the statute.   It alleges that he was using a certain tenement and dwelling-house for the manufacture of coats, vests, and other garments by other than immediate members of his family.   We suppose that it is a matter of which a Court may take judicial notice that the manufacture of wearing apparel in improperly ventilated, unsanitary and overcrowded apartments will likely promote the spread of, if it does not engender, disease, and it is obviously within the police power of the State to regulate the number of persons who may be employed in any tenement, or other establishment, where this manufacturing is carried on so that the public health may be conserved. What has just been said is equally applicable to the second count and we need not further discuss it.   The third count has relation to a provision of the Code existing prior to the adoption of the Act of 1902.   By sec. 149C of Art. 27 of the Code, of which the Act of 1902, is an amendment, it was required that at least four hundred cubic feet of clear space should be allowed in each room for each occupant in manufacturing establishments, and the Act of 1902 required that a permit should be secured from the Chief of the Bureau of Industrial Statistics setting forth the number of persons allowed to be employed in each room.   The number thus employed was, of course, regulated by the amount of air surface to which under sec. 149C employees were entitled.   The failure to procure such a permit is the charge alleged in the third count.   It certainly requires no discussion to show that such a regulation is strictly and essentially a health regulation.   The overcrowding of factories and the inhalation of impure air, where there is not sufficient surface afforded to each employee are obviously calculated to produce or foster disease, and the manufacture of articles of wearing apparel in overcrowded rooms or apartments, under these conditions, is unquestionably liable to spread contamination.   The fourth count of the indictment need not to be further considered.   What has been said in reference to the third is sufficient to support the fourth. The fifth count charges that the appellee did not keep a written register of the names and addresses of all persons to whom

work was given to be made.   If it is important, as we have
said it was, that these overcrowded, and unhealthy, and un-
sanitary tenement houses should be subject to the inspection
and control of some designated health officer, it goes without
saying, that the provision would be of little avail if the propri-
etor could give out the work to others without keeping a reg-
ister of their names and addresses, because the health officer
without the aid of such register would be unable to trace the
localities where the work was being done.   The whole scheme
of the Act appears to us to be in furtherance of the protection
and preservation of the public health and whatever criticisms
may be made upon the method of its enforcement, no con-
vincing reason has been suggested to show that its terms have
not a real and a substantial relation to the subject of the police
power of the State.

The statute invades no private right of property and does
not confer upon any official either arbitrary or unrestricted
power.   It certainly does not in terms expressly do either.
It has no relation to homes where manufacturing of the enu-
merated articles is not carried on.   The whole tenor of the
enactment distinctly indicates that its provisions are aimed at
and are intended to apply to tenements and other buildings
where the garments specified are manufactured for sale; and
that it has no relation to homes or places where apparel not
manufactured for sale may be made.   Nor does the statute
clothe the officers its provisions allude to with arbitrary
power.   As well might it be said that a police officer who is
authorized to summarily seize property which could only be
put to an illegal or criminal use, acted arbitrarily in making
such a seizure before a judicial adjudication condemned the
thing seized.   This Court has emphatically said in *Police Coms.*
v. *Wagner*, 93 Md. 191, "that the State has power to pass
such laws as are necessary to protect the health, morals or
peace of society; and where the summary seizure, or even the
destruction, of the offending thing is necessary for the public
safety, may authorize that to be done, and such laws are not
incompatible with those constitutional limitations which de-

clare that no person shall be deprived of his property without due process of law." In the case just cited the alleged arbitrary seizure of a slot-machine by the police authorities of Baltimore City was upheld as being within the legitimate exercise of the police power of the State. In the earlier case of *Ford* v. *The State*, 85 Md. 465, the traverser was indicted under the *Act of 1894, ch. 310*, for having in his possession lists or slips of lottery or policy drawings. That was a thing which the statute prohibited, even though the accused party did not know what the lists or slips were or that they were prohibited articles. The statute was upheld as a legitimate exercise of the police power in the face of the contention that its provisions arbitrarily created an indictable offence where there was not only a total absence of criminal intent, but a complete ignorance on the part of the traverser as to what the lists or slips were.

An officer, who, under pretext of executing the sweatshop statute, would assume to exert an arbitrary or unwarrantable power, would be answerable for his misconduct, just as would be any other trespasser. Rightly interpreted we find no imperfections in the statute assailed in this case.

Entertaining the views we have expressed we must reverse the judgment appealed from and award a new trial.

> *Judgment reversed with costs and new*
> *trial awarded.*

(Decided February 19th, 1904.)