# WILLIAM R. SCHULTZ *vs.* STATE OF MARYLAND.

*Police Power of Baltimore City—Ordinance Regulating Removal of Garbage.*

The Charter of Baltimore City empowers the Mayor and City Council to have and exercise within the limits of the city all power commonly known as the police power, to the same extent as the State could exercise the same within said limits, and also to pass such ordinances as it may deem expedient in maintaining the health and welfare of the city. An ordinance provided that no person except an employee of the city should carry any garbage or other refuse through any streets without first obtaining a permit so to do from the Commissioner of Health, and the Commissioner was vested with discretion to grant and revoke such permits. *Held,* that this ordinance is a valid exercise of the police power vested in the city, since regulations concerning the removal of garbage and offal have a direct relation to the public health.

The fact that a person indicted for a violation of this ordinance removed from hotels only scraps of animal and vegetable matter rejected as food, commonly called garbage, which he fed to hogs, and had invested money in the business of so raising hogs, does not exempt him from the operation of the ordinance, since much of this kind of matter is dangerous to the public health, and its removal may properly be made

subject to public regulation, and all private business is sub-
ject to regulations designed to promote public health.

*Decided January 14th, 1910.*

Appeal from the Criminal Court of Baltimore City (HAR-
LAN, C. J.).

The cause was argued before BOYD, C. J., BRISCOE,
PEARCE, SCHMUCKER, BURKE, THOMAS, PATTISON and
URNER, JJ.

*James J. McNamara,* for the appellant.

*Isaac Lobe Straus, Attorney-General* and *Eugene O'Dunne*
(with whom was *A. S. J. Owens* on the brief), for the appel-
lee.

BURKE, J., delivered the opinion of the Court.

The appellant was indicted, tried, and convicted in the
Criminal Court of Baltimore for a violation, on August 5th,
1909, in the City of Baltimore, of Ordinance No. 58 of the
Mayor and City Council of Baltimore, approved March 17,
1904. This ordinance is found in *Article 14, sections 108,
109* and *110 of the Baltimore City Code,* and is as follows:

108. No person except the employes of the City of Balti-
more, engaged in public work, or persons under contract with
the City of Baltimore engaged in public work, shall convey
any garbage, house offal or other refuse, animal or vegetable
matter through any street, lane, road, alley or public highway
of the City of Baltimore, without having first obtained a per-
mit so to do from the Commissioner of Health; after obtain-
ing such permit, it shall be lawful for the licensee named in
such permit to convey such garbage, house offal, or other re-
fuse, animal or vegetable matter, in accordance with the
terms and conditions of such permit, but in no other manner.

109. The Commissioner of Health may, in his discretion,
grant the permit referred to in the next preceding section of

this article, whenever in his judgment the public health will not suffer thereby; and the Commissioner of Health is authorized at any time when in his judgment, the public health will suffer by the continuance of any permit so granted by him, to revoke the same.

110. Any person or persons violating the provisions of the two next preceding sections of this article, shall be liable to a fine of two dollars ($2.00) for each offense.

The indictment contains one count, and, after setting out the terms of the ordinance, charged that the appellant not being then and there, on said August 5th, an employee of the city, engaged in public work, and not then and there a person under contract with the city engaged in public work, unlawfully did then and there convey, on said 5th day of August, in the year 1909, certain garbage, house offal and other refuse, animal and vegetable matter, through a certain street. lane, road, alley and public highway of said city, without having first obtained a permit so to do from the Commissioner of Health of the city.

The traverser filed a special plea to this indictment which, in part, is as follows: That three years prior to July 15th, 1909, his employer, Charles H. Scheeler, obtained from the Commissioner of Health of Baltimore City, a permit to haul garbage through the streets, avenues, lanes and alleys of Baltimore City; that during said three years he hauled in liquid tight wagons only fresh scraps of animal and vegetable matter rejected as human food, commonly called garbage, taken twice each day from the Belvedere Hotel, other hotels, clubs and apartment houses, and used said scraps of animal and vegetable matter rejected as human food, commonly called garbage, to feed hogs in Baltimore County; that during said three years the traverser's employer had an agreement with the owners of the Belvedere Hotel that, in consideration of receiving said scraps of animal and vegetable matter rejected as human food, commonly called garbage, the traverser's said employer promised to return to the owners of the Belvedere Hotel all silverware found in said scraps of animal and veg-

etable matter rejected as human food, commonly called gar-
bage; and that during said three years in execution of that
agreement the traverser's employer returned to the owners of
that hotel silverware valued at about six thousand dollars; that
during said three years the traverser's said employer invested
thousands of dollars in raising hogs for sale, relying upon his
right to haul said scraps of animal and vegetable matter to
feed said hogs; that in pursuance of Ordinance No. 109, ap-
proved May 7th, 1908, the Mayor and City Council of Bal-
timore entered into a contract with the Southern Product
Company, a corporation of West Virginia, whereby that com-
pany agreed to remove and finally dispose of the garbage,
dead animals and market refuse in the City of Baltimore for
the period of ten years beginning January 1st, 1908, and
ending December 31st, 1917, for the sum of six hundred and
forty-six thousand dollars; that on July 15th, 1909, the Com-
missioner of Health of Baltimore City revoked said permit,
nevertheless the traverser continued to haul through the
streets, avenues, lanes and alleys of Baltimore City said
scraps of animal and vegetable matter rejected as human
food, commonly called garbage, for the doing of which he was
arrested and indicted. The plea then sets out the Ordinance
No. 109 which disclosed the contract between the city and the
Southern Product Company for the removal and final dis-
position of the garbage, dead animals, and market refuse of
the City of Baltimore. The State demurred to this plea and
the Court sustained the demurrer. The traverser then pleaded
not guilty, and upon the issue joined upon this plea the case
was tried before the Court, and resulted in the verdict of
guilty and judgment that the traverser pay a fine of two dol-
lars and costs, and from this judgment he has appealed.

Two questions only are presented for decision upon the
record:

1st. Is the ordinance, which we have quoted and under
which the traverser was indicted, valid?

2nd. Do the facts stated in the plea, and which are admitted by the demurrer to be true, constitute a good defense to the indictment?

The validity of the ordinance involves an inquiry into the power of the Mayor and City Council to pass it. If that body had no power to enact it the ordinance is void; if, in enacting it, the city was acting within the powers delegated to it by the State, the ordinance is valid. This power must be looked for in the charter or legislative grant. In *St. Mary's Industrial School* v. *Brown,* 45 Md. 311, it is said: "And first and principally, we must bear in mind that all such powers are delegated, and depend upon legislative charter or grant; and that the corporate authorities can exercise no power which is not in express terms or by fair and reasonable implication conferred upon the corporation. In construing a grant of municipal powers, in the case of *Minturn* v. *Larue,* 23 Howard, 435, the Supreme Court of the United States but announced a well established rule when it said: 'It is a well settled rule of construction of grants by the Legislature to corporations, whether public or private, that only such powers and rights can be exercised under them as are clearly comprehended within the words of the Act or derived therefrom by necessary implication, regard being had to the objects of the grant. Any ambiguity or doubt arising out of the terms used by the Legislature must be resolved in favor of the public."

The subject matter of the ordinance under consideration relates to the health of the city. It is, therefore, the exercise by the city of the police power. It is said in *Strong* v. *Miss.,* 101 U. S. 814, that "many attempts have been made by this Court and elsewhere to define the police power, but never with entire success. It is always easier to determine whether a particular case comes within the general scope of the power, than to give an abstract definition of the power itself which will be in all respects accurate. No one denies, however, that it extends to all matters affecting the public health or public morals."

JUSTICE MILLER in the *Slaughter House Cases,* 16 *Wallace,* 36, said: "This power is, and must be from its very nature be, incapable of any very exact definition or limita· tion. Upon it depends the security of social order, the life and health of the citizen, the comfort of an existence in a thickly populated community, the enjoyment of private and social life, and the beneficial use of property." "It extends," says another eminent Judge, "to the protection of the lives, limbs, health, comfort, and quiet of all persons, and the protection of all property within the State; * * * and persons and property are subjected to all kinds of restraints and bur· dens in order to secure the general comfort, health and prosperity of the State. Of the perfect right of the Legislature to do this no question ever was, or, upon acknowledged general principles, ever can be made, so far as natural persons are concerned."

In *State* v. *Hyman,* 98 Md. 596, where the whole subject of the police power is elaborately reviewed, Judge McSherry emphasizes the well recognized distinction that must be ob- served by the Court when exercising its revisory jurisdiction over police enactments. In a case where an Act of the Legislature is under consideration the Court is confined to the inquiry whether the act has a *real and substantial relation to the police* power. If it has such a relation, "then no matter how unreasonable nor how unwise the measure itself may be, it is not for the judicial tribunals to avoid it upon these grounds. Numerous illustrations of this principle are furnished in reported cases. "For it must now be considered as an established principle of law in this country that there are no limits whatever to the legislative powers of the State, except such as are prescribed in their own constitutions, or in that of the United States; consequently, that the Courts, in the performance of their duty to confine the legislative department within the constitutional limits of its power, cannot nullify and avoid a law, simply because it conflicts with the judicial notions of natural rights or morality or abstract justice. * * * But whenever power has been delegated by the

Legislature to a municipal corporation to adopt and promulgate ordinances for the protection of the public health, morals or safety, the *reasonableness* of the measure enacted by the municipality is a feature to which the Courts look to see whether the measure is within the power granted; and they do this upon the assumption that the Legislature did not intend to empower the municipality to enact unreasonable, or oppressive ordinances."

We have no doubt that the Mayor and City Council had the power under its charter to pass the ordinance in question. Its power to pass ordinances of the character of the one here assailed was fully considered in the recent case of *Rossberg* v. *The State,* 111 Md. 394, decided at the present term, in which JUDGE PEARCE, speaking for the Court, said: "The powers thus vested in the city are broad and sweeping, and are expressed in terms which indicate a liberal view of the need of broad powers for effective local government of a great city. They are contained in thirty-one sections of the city's charter as it appears in the Baltimore City Code of 1906, and covered twenty-seven pages of that volume. Section 18, entitled, "Police Power" is as follows: "The Mayor and City Council of Baltimore shall have full power and authority: To pass ordinances for preserving order, and securing property and person from violence, danger and destruction, protecting the public and city property, rights and privileges from waste or encroachment, and for promoting the great interests and securing the good government of the City.

" To have and exercise within the limits of the City of Baltimore all the power commonly known as the police power, to the same extent as the State has or could exercise the said power within said limits. But no ordinance heretofore passed or that shall hereafter be passed by the Mayor and City Council of Baltimore, shall hereafter conflict or interfere with the powers or the exercise of the powers of the board of police of the City of Baltimore, heretofore created, nor shall the said city, or any officer or agent of the city, or of the Mayor thereof, in any manner impede, obstruct, hinder or

interfere with the said board of police, or any officer, agent
or servant thereof or thereunder."

Section 31, entitled "Welfare and Others" is as follows:
"The foregoing or other enumeration of powers in this arti-
cle shall not be held to limit the power of the Mayor and City
Council of Baltimore, in adddition thereto, to pass all ordi·
nances, not inconsistent with the provisions of this article or
the laws of the State, as may be proper in executing any of
the powers either express or implied, enumerated in this sec·
tion and elsewhere in this article, as well as such ordinances
as it may deem expedient in maintaining the peace, good
government, health and welfare of the City of Baltimore;
and it may provide for the enforcement of all such ordinances
by such penalties and imprisonment as may be prescribed by
ordinance; but no fine can exceed five hundred dollars, nor
imprisonment exceed twelve months for any offense."

"We have not been referred to, nor have we discovered, any
other provisions of the charter of the city which relates to the
questions involved in this case.

"Broader or more comprehensive police powers could not be
conferred under any general grant of police power, for the
purposes mentioned in section 18, than those granted in that
section, and when we consider the 'Welfare Clause' of the
Charter, section 31, greater emphasis could not be laid upon
the implied powers of the city for the maintenance of the
peace, good government, health and welfare of the city then
is there laid."

It cannot be seriously contended that an ordinance which
deals with garbage, house offal or other refuse, animal or
vegetable matter, is not one which has a direct relation to the
police power, or that it is not the duty of the city in the inter·
est of the public health or comfort to assume the regulation
and control of such matters.

The fact that this accumulation contains fresh scraps of
animal and vegetable matter does not prevent the extension
of the police power of the city over the whole subject, as this
ordinance does. To admit the right of the appellant, inde-

pendent of the city's control, to select and haul from hotels, clubs and apartment houses such scraps would very greatly weaken the effective control of the municipality over the sub-ject. It would result to a very great extent in the substitu-tion of individual judgment in a matter of vital concern to the city for the judgment of the municipal authorities. It is evident that the recognition of such an uncontrolled right would be fraught with great danger to the public health. "There is so much of this kind of matter that is offensive and dangerous to the health of the community, that it all may be properly made subject to public regulation and control." *State* v. *Orr,* 68 Conn. 101.

The appellant complains of the effect of the ordinance upon his business, and of what he considers to be the unwarranted action of the Commissioner of Health in revoking his permit. But these things, if true, do not affect the validity of the ordinance, or constitute a defense to the indictment. His business and property are "subject to police supervision and control," and his private interests must be subservient to the general interest of the community. *Slaughter House Cases, supra.*

Tested by the principles herein announced we hold the ordinance involved in this case to be a valid exercise by the Mayor and City Council of the police power vested in it by its charter, and since the special plea of the appellant admits that he did the very thing which the ordinance declared he should not do without a permit from the Commissioner of Health, there was no error in sustaining the State's demurrer to the plea.

There are many irrelevant and collateral matters alleged in the plea which, in view of the conclusion we have reached, need not be discussed.

As to the complaints made against the Commissioner of Health, we need only to quote the language of JUDGE Mc-SHERRY in the *Hyman Case, supra* "It is not to be assumed that the public functionary will act in an oppressive or un-lawful manner. Discretion must be reposed somewhere. If

an official should transcend the legitimate limits of the author-
ity with which the statute clothes him, the injured party is
not without redress."

*Judgment affirmed with costs.*