## MARYLAND BOARD OF PHARMACY
### *v.* SAV-A-LOT, INC. ET AL.

[No. 2, September Term, 1973.]

*Decided October 31, 1973.*

The cause was argued before MURPHY, C. J., and BARNES, McWILLIAMS, SINGLEY, SMITH, DIGGES and LEVINE, JJ.

*Lee Stuart Thomson, Special Assistant Attorney General,* with whom were *Francis B. Burch, Attorney*

*General,* and *Paul Walter, Assistant Attorney General,* on the brief, for appellant.

*Amicus Curiae* brief filed by Maryland Pharmaceutical Association, Inc., *Joseph S. Kaufman* on the brief.

*Amicus Curiae* brief filed by Public Citizen, Inc. and Health Research Group, *Raymond T. Bonner* and *Kalman R. Hettleman* on the brief.

*Amicus Curiae* brief filed by Legal Services for the Elderly Poor, *Larry Gibson, Bernard C. Durham* and *Jonathan A. Weiss* on the brief.

*George W. McManus, Jr.,* for appellees.

LEVINE, J., delivered the opinion of the Court. SMITH, J., dissents and filed a dissenting opinion at page 123 *infra.*

We are presented here with a constitutional challenge to Maryland Code (1957, 1971 Repl. Vol.) Art. 43, § 266A (c) (4) (iv)[1] resulting from an equity suit brought by appellees in the Circuit Court of Baltimore City. It subsequently became an action at law upon being transferred to the Superior Court of Baltimore City in consequence of a demurrer to the

---

\* \* \*

1. "(c) *Grounds.* — The Board's power either to reprimand a pharmacist or assistant pharmacist or to suspend or revoke his license shall be for any of the following causes:

\* \* \*

"(4) Upon proof satisfactory to the Board of Pharmacy that a pharmacist or assistant pharmacist is guilty of grossly unprofessional conduct. The following acts on the part of a pharmacist or assistant pharmacist are hereby declared to constitute grossly unprofessional conduct:

\* \* \*

"(iv) *The advertising to the public by any means,* in any form or through any media, *the prices for prescriptions, dangerous or nonproprietary drugs,* or fees for services relating thereto *or any reference to the price* of said drugs or prescriptions whether specifically or as a percentile of prevailing prices, or by *the use of the terms 'cut rate,' 'discount,' 'bargain' or terms of similar connotation."* (emphasis added).

equity bill. Following a trial on the merits, in the course of which the parties presented considerable evidence, the court (Carter, J.) wrote a thoroughly-considered opinion, and declared the statute unconstitutional as a violation of appellees' due process rights under the Fourteenth Amendment to the Federal Constitution.

Appellees, who are three corporations operating seven retail stores in Maryland, instituted the action. Five of these outlets trade under the name of Sav-A-Lot and are essentially variety stores that do not contain pharmacy departments. The other two stores, known as Leader Drugs, operate pharmacies. The dispute between the parties began when appellant (the Board) refused to sanction the use of the name, "Sav-A-Lot Drugs" for appellees' "prescription-type drug store[s]" because of the prohibition enunciated in Art. 43, § 266A (c) (4) (iv). The controversy has now ripened into a broader issue — whether appellees may advertise prescription drug prices, as well as the terms proscribed by the statute that connote price discounts on such drugs.

Briefly summarized, the evidence in the trial court showed the following: Dr. Sidney Wolf, a specialist in internal medicine, a former staff member at the National Institutes of Health, and currently affiliated with an organization known as "Health Research Group," testified to the "great variation in [prescription drug] prices[s] from store to store within a given city." This testimony, which has neither been contradicted below nor is seriously challenged here, was amply supported by documentary evidence admitted by the trial court.

This witness also pointed out that senior citizens, many of whom are on "maintenance" drugs, are prevented from "shopping" for the lowest available prices by the statutory proscription against advertising. He testified that this is a matter of great concern for the elderly, the sick, and the economically disadvantaged, for it is such persons who are less mobile and therefore less able to survey drug stores for comparative prices. For these reasons, according to the witness, the consumer's present dilemma of identifying those stores which offer the lowest prices for prescription

drugs would be solved by removing the prohibition against prescription drug advertising. This testimony was supported, in part, by Father Donald Wilson, whose parish church operates an apartment house for senior citizens in the City of Baltimore.

To counter this evidence, appellant produced Norman J. Levin, a pharmacist in Baltimore County and President of the Maryland Board of Pharmacy. He presented a number of reasons why in his opinion, and that of the entire Board, the statute was necessary. We shall allude to them later in this opinion.

In this Court, appellant renews its argument that the statute does not violate the Due Process Clause of the Fourteenth Amendment, and urges upon us that it is a reasonable exercise of the state's police power. Thus, the question we must answer is whether this statute, as an exercise of the state's police power, provides a real and substantial relation to the public health, morals, safety, and welfare of the citizens of this state, *Liggett Co. v. Baldridge*, 278 U. S. 105, 111-12, 49 S. Ct. 57, 73 L. Ed. 204 (1928); *Stevens v. City of Salisbury*, 240 Md. 556, 564, 214 A. 2d 775 (1965); *Davis v. State*, 183 Md. 385, 393, 37 A. 2d 880 (1944); *Dasch v. Jackson*, 170 Md. 251, 263, 183 A. 534 (1936). The wisdom or expediency of a law adopted in the exercise of the police power of the state is not subject to judicial review, and such a statute will not be held void if there are any considerations relating to the public welfare by which it can be supported, *Salisbury Beauty Schools v. St. Bd.*, 268 Md. 32, 48, 300 A. 2d 367 (1973); *Davis v. State, supra*, at 397; *State v. Seney Company*, 134 Md. 437, 448, 107 A. 189 (1919). Hence, this statute carries with it a strong presumption of constitutionality, *Gino's v. Baltimore City*, 250 Md. 621, 636, 244 A. 2d 218 (1968); *Deems v. Western Maryland Ry.*, 247 Md. 95, 102, 231 A. 2d 514 (1967); *Magruder v. Hall of Rec'ds Comm'n*, 221 Md. 1, 6, 155 A. 2d 899 (1959).

Nevertheless, if a statute purporting to have been enacted to protect the public morals or the public safety has no real or substantial relation to those objects or is a palpable invasion of rights secured by fundamental law, it is our duty

to so adjudge and thereby give effect to the Constitution, *Mugler v. Kansas*, 123 U. S. 623, 661, 8 S. Ct. 273, 31 L. Ed. 205 (1887); *Hiller v. State*, 124 Md. 385, 391, 92 A. 842 (1914); *State v. Hyman*, 98 Md. 596, 615, 57 A. 6 (1904).

Statutes similar to that under attack here have been upheld on constitutional grounds, *Patterson Drug Company v. Kingery*, 305 F. Supp. 821 (W.D. Va. 1969); *Supermarkets Gen. Corp. v. Sills*, 93 N. J. Super. 326, 225 A. 2d 728 (1966). Other states have, however, declared such statutes unconstitutional, *Florida Board of Pharmacy v. Webb's City, Inc.*, 219 So. 2d 681 (Fla. 1969); *Stadnik v. Shell's City, Inc.*, 140 So. 2d 871 (Fla. 1962); *Pennsylvania State Board of Pharmacy v. Pastor*, 441 Pa. 186, 272 A. 2d 487 (1971), 44 A.L.R.3d 1290. Other states have resolved analogous conflicts relying upon other grounds, *see West Romaine Corp. v. California State Board of Pharmacy*, 266 Cal. App. 2d 901, 72 Cal. Rptr. 569 (1968); *Oregon Newspaper Publishers Ass'n v. Peterson*, 244 Ore. 116, 415 P. 2d 21 (1966).

In *Patterson Drug Company v. Kingery*, *supra*, a three-judge federal court had before it a Virginia statute which subjected any pharmacist to a charge of unprofessional conduct who:

> "issues, publishes, advertises or promotes, directly or indirectly, in any manner whatsoever, any amount, price, fee, premium, discount, rebate or credit terms for professional services or for drugs containing narcotics or for any drugs which may be dispensed only by prescription." 305 F. Supp. at 823.

Relying principally upon the cases of *Williamson v. Lee Optical Co.*, 348 U. S. 483, 75 S. Ct. 461, 99 L. Ed. 563 (1955) and *Semler v. Dental Examiners*, 294 U. S. 608, 55 S. Ct. 570, 79 L. Ed. 1086 (1935) for the rationale that the practice of pharmacy is a professional pursuit — and thus "subject to regulation and control in the public interest" — the federal court in Virginia sustained the prohibition against

advertising the retail prices of prescription drugs as a constitutional exercise of the state's police power.

In *Supermarkets, supra,* the New Jersey court upheld a state law which declared as grossly unprofessional conduct:

> "The promotion, direct or indirect, by any means, in any form and through any media of the prices for prescription drugs and narcotics or fees or for services relating thereto or any reference to the price of said drugs or prescriptions whether specifically or as a percentile of prevailing prices or by the use of the terms 'cut rate,' 'discount,' 'bargain,' or terms of similar connotation"; 225 A. 2d at 732.

In part, the court applied the same reasoning as the *Kingery* court, and concluded that the plaintiffs had not rebutted the "strong presumption of constitutionality" with which the statute was cloaked.

In *Stadnik v. Shell's City, Inc., supra,* the Florida Supreme Court affirmed a lower court ruling which struck down as unconstitutional a regulatory measure promulgated by the State Board of Pharmacy against advertising ". . . the name or price of tranquilizing drugs or antibiotics or other drugs which can be purchased and dispensed only by means of a prescription from a physician," 140 So. 2d at 872. There, as in the Virginia, New Jersey and Pennsylvania cases cited above, the court was met by a contention that the statute was a reasonable exercise of the state's police power. It rejected that argument, however, holding that there was "no reasonable justification for such an administrative intrusion on private rights when the regulation is so completely lacking in public benefit," 140 So. 2d at 875. Later, upon the authority of *Stadnik,* the Florida Supreme Court, in *Florida Board of Pharmacy v. Webb's City, Inc., supra,* declared unconstitutional a statute which provided:

\* \* \*

> "No pharmacist, owner or employee of a retail drug establishment shall use any communication

media to promote or advertise the use or sale of any of the following:

\* \* \*

"(f) Any drugs which require a prescription." 219 So. 2d at 681 (emphasis omitted).

In *Pennsylvania State Board of Pharmacy v. Pastor, supra,* the Pennsylvania Supreme Court considered the constitutionality *vel non* of a statute which made it unlawful for a pharmacist to advertise the prices of dangerous or narcotic drugs. Elsewhere the statute defined as "dangerous" all drugs which can be dispensed only with a physician's prescription. The court found that the statute did not bear a "substantial relation to any of the objects" to which it was directed, 272 A. 2d at 494; thus it held the statute unconstitutional insofar as it prohibited the advertising of "dangerous drugs," 272 A. 2d at 495.

The Board here, in arguing for the constitutionality of the statute, advances these grounds to support its position:

(1) That the advertising of drug prices will increase the demand for drugs, thereby creating an atmosphere conducive to drug abuse.

(2) By encouraging consumers to "shop around," the advertising of drug prices will make it unlikely that they will patronize only one pharmacy. Thus, the pharmacist will no longer be in a position to "monitor" prescriptions to determine whether the consumer is using antagonistic drugs.

(3) That, since pharmacy is a profession which affects the public health and welfare, the state, in the exercise of its police power, may prohibit such advertising to prevent rivalry demeaning to the profession.

(4) That advertising of drug prices will result in increased pressure on physicians to prescribe larger quantities than are medically indicated to enable their patients to take advantage of quantity discounts.

The first reason asserted by the Board in defense of the

statute is that the advertising of drug prices will increase the demand for dangerous drugs. Undoubtedly, the answer to this argument is found in the comprehensive regulatory scheme reflected by other provisions of the Maryland Code.[2] In the face of a contention similar to that being made here, the Pennsylvania Supreme Court in *Pastor, supra,* said:

\* \* \*

"We must therefore conclude that because of the highly regulated structure of the pharmaceutical profession, and the fact that the consumer cannot choose his purchases, it would appear most unlikely that advertising the prices of retail prescription drugs would, or could, have any impact on the demand or consumption of such drugs. . . ." 272 A. 2d at 493.

We think that conclusion is apposite here.

The second argument made by the Board is that advertising of drug prices will encourage consumers to "shop around," thus preventing pharmacists from monitoring prescriptions. In so contending, the Board derives only limited support from the two cases upon which it relies most heavily, *Patterson Drug Company v. Kingery* and

---

2. Code (1957, 1971 Repl. Vol.) Art. 43, § 122 prohibits persons from practicing medicine unless licensed by the Board of Medical Examiners in accordance with the many stringent requirements imposed by law; § 269 of Art. 43 provides that only persons under the supervision of a registered pharmacist or other persons duly approved by the Board may prepare drugs; § 249 provides that no person shall maintain a pharmacy without a proper certificate, and may not leave a pharmacy at any time in charge of one who is not a registered pharmacist; that same section permits only registered pharmacists to compound prescriptions, as well as physicians and dentists who are permitted to personally compound and dispense their own prescriptions; §§ 249-289 of Art. 43 contain other requirements designed to protect the general health, safety and welfare of the public with regard to the compounding and dispensing of drugs; Art. 27, § 287 (a) makes it unlawful for any person to possess any controlled dangerous substance unless validly obtained pursuant to a valid prescription or order from a practitioner; likewise, it is unlawful to obtain such substance by fraud, deceit, misrepresentation or forgery, Art. 27, § 287 (b); and subsection (v) of § 266A (c) (4) prohibits any type of advertising by pharmacists that implies professional superiority over others.

*Supermarkets Gen. Corp. v. Sills*, both *supra*. With respect to a similar claim, the court said in *Kingery*:

\* \* \*

" ... Some pharmacists, probably a minority, systematically monitor prescriptions by family records to avoid allergic reactions or the simultaneous use of antagonistic drugs, of which the patient's doctor may not be aware. Although monitoring is *not completely effective* because of the mobility of customers and the availability of nonprescription drugs which may be antagonistic, it is a benefit to the public." 305 F. Supp. at 824 (emphasis added).

And in *Supermarkets, supra*, the court stated:

\* \* \*

"It was urged that the patient's records are reviewed by the pharmacist only for the purpose of checking prices on prescriptions previously filled for the customer. Perhaps that may be the practice of many pharmacists, but there may be *infrequent* instances where a pharmacist does 'monitor' the prescription for the purpose of possibly detecting the prescription of an antagonistic drug. *Infrequent* as such occasions may be, they may justify the enactment of [the statute]." 225 A. 2d at 737 (emphasis added).

In noting the restraint that is reflected in those two statements, we might observe that "monitoring" is one of the two reasons upon which each of those cases rested its decision.

Again, we think the correct answer to this argument is found in *Pastor, supra*. There the court aptly stated:

\* \* \*

"We do not believe, however, that this asserted reason [monitoring] is sufficient to sustain the

prohibition. The Commonwealth has produced no evidence to indicate the extent, if any, to which pharmacists monitor prescriptions, and even the courts which have accepted this rationale have admitted that monitoring is *'infrequent'* and *'not completely effective.'* Further, it is primarily the physician's duty to be certain that he is not prescribing drugs antagonistic to those already being taken by his patient. Indeed, it would appear that if the Legislature was in fact concerned about the prescribing of antagonistic drugs, it would have chosen a route more direct than simply prohibiting the advertising of their prices. . . ." 272 A. 2d at 493 (emphasis added).

Similarly, here no evidence was produced "to indicate the extent, if any, to which pharmacists monitor prescriptions." We strongly suspect that monitoring, which may have been common in the past, hardly exists today. The President of the Board disclosed unfamiliarity with this term when first asked to define it. Given the diversification of modern retailing practices and the mobility of our society, it is quite likely that the physician is better able to monitor the possible ingestion of antagonistic drugs than the pharmacist. Therefore, in this context, we too are unpersuaded that the legislative means employed have a "real or substantial relation" to the objects for which they are allegedly designed.

The Board next argues that since pharmacy is a profession which affects the public health and welfare, the state may prohibit practices that tend to result in unseemly advertising, and possibly the lowering of professional standards. Unquestionably, this is the major premise upon which *Kingery* and *Supermarkets*, both *supra,* were decided.

The Board likens the pharmacist's position to that of physicians, *Davis v. State, supra,* opthalmologists, optometrists, and opticians, *Ullom v. Boehm,* 392 Pa. 643, 142 A. 2d 19 (1958); *Williamson v. Lee Optical Co., supra,* and dentists, *Semler v. Dental Examiners, supra.* It also

says that its position is similar to the beauty school operators in *Salisbury Beauty Schools v. St. Bd., supra,* where we upheld the constitutionality of the statutory prohibition against charging prices for the clinical work performed by students in beauty schools. The analogy does not apply here, since beauty schools, unlike pharmacies, are not engaged in a business relationship with the consumer. In *Salisbury,* we said:

" . . . The schools are not engaged in the *business* of supplying services to the public, but are engaged in qualifying students to become practitioners of the art. . . ." 268 Md. at 59 (emphasis added).

As we shall observe later, pharmacies are predominately engaged in a retailing enterprise.

Furthermore, as Judge Carter noted in the court below, appellant's comparison of the professional aspects of pharmacy and medicine, *Davis v. State, supra,* is inapposite. The Courts in *Davis* and *Semler, supra,* were confronted with the effect upon a gullible public of advertising professional services. The Court in *Davis* was concerned that the physician would use "knowledge of mass psychology and skill in appealing to the emotions and hopes of the uninformed and credulous," 183 Md. at 394. Likewise, in *Semler, supra,* the Supreme Court was concerned with the use of "advertising methods 'to lure the credulous and ignorant members of the public to [dentists'] offices for the purpose of fleecing them,' " 294 U. S. at 612. Clearly, the thrust of these cases was the protection of an unwitting public against the lure of misleading advertising of professional *services.* These arguments would be more appropriately advanced in support of Code Art. 43, § 266A (c) (4) (v) which prohibits pharmacists from advertising their "professional superiority." They are unpersuasive here. When describing the quality of services, advertising may be prone to distort; when listing definite prices or discounts, it serves as a tool to educate rather than to deceive. Thus, pharmacists may be distinguished from the other "professions" discussed above, in that price advertising of

retail drugs casts no unfavorable reflection on the professional aspect of pharmacy by deceiving the public about the type of services available.

Furthermore, none of the other professions is as involved with retailing as is pharmacy. The effort on the part of the Board to demonstrate the professional aspects of pharmacy by its sole witness, Mr. Levin, President of the Board, failed completely. His testimony is replete with references to pharmacy's retail characteristics. In describing how advertising draws the consumer into the pharmacy, he said:

"Once he passes the door, he is exposed and he is vulnerable to purchase anything else in the store. *And this is the whole retail game, you might say, today. This is what the retail business is. It is a method of advertising items to the public at prices that will induce them to come into the place to buy all of the other things you are trying to sell them,* and that is what certain deceitful, lecherous people want to do with the prescription business." (emphasis added).

Ironically, Mr. Levin admits that he, himself, has an advertising program in conjunction with a group of other proprietors, and said that "[w]e have a pharmacy that does a pretty fine *business* in prescriptions." (emphasis added). Later, he also admitted that "unfortunately" druggists are essentially retailers. Furthermore, he agreed that on a national average, only 10% of prescriptions are compounded, *see also, Supermarkets Gen. Corp. v. Sills, supra,* at 735; but that this was not the case in his store. No evidence was submitted to show that this statistic is not representative of the State of Maryland. Mr. Levin also says he has not noticed any harm as a result of posting the prices of drugs as required by the National Economic Stabilization Act.

Mr. Levin's testimony underscores the fact that pharmacy is rapidly evolving into almost exclusively a retail business where prescription drugs constitute only about 11% of the

sales volume of chain drug stores; [3] and as noted above, only 10% of prescription drugs are compounded. The retail aspects of pharmaceutical business were also noted in a study prepared by the Department of Justice.[4] Likewise, the Internal Revenue Services's "Posting Requirements for Retailers of Prescription Drugs" notes: [5]

"The dispensing of prescription drugs is considered to be a *retail activity*, and therefore, it is covered by Price Commission regulations requiring that base prices be posted. The fact that a *professional pharmacist is employed to dispense drugs is incidental to the sale of those drugs and does not alter the retail nature of the transaction.*" (emphasis added).

When the regulation of pharmacy extends beyond the qualifications of pharmacists and the safety of the products, and encompasses the commercial aspects of the profession, serious questions of constitutional validity arise, *Milligan v. Board of Registration in Pharmacy*, 348 Mass. 491, 204 N.E.2d 504, 510 (1965).

*Supermarkets, supra*, the case cited by the Board as its leading authority, supports our reasoning and lends a final *coup de grace* to the arguments made by appellants:

"The field of pharmacy is an admixture of both professional and commercial functions. The pharmacist, while practicing a profession by compounding drugs and rendering the incidental services to which reference has already been made,

---

3. American Druggist, May 29, 1972, at 17.

4. "The Department of Justice believes that the major effect of legislation or regulations prohibiting price advertising of prescription drugs is to reduce *retailer* incentives to engage in price competition with resulting higher costs to the public." (emphasis added). Research Paper and Policy Statement of the United States Department of Justice Regarding State Restrictions on the Advertising of Retail Prescription Drugs (Summer, 1971).

5. U.S. Treasury, Internal Revenue Service, Economic Stabilization Program, "Posting Requirements for Retailers of Prescription Drugs," Publication S-3010 (Rev. 9-72) Washington, D. C.

also is engaged in a commercial venture requiring merchandising and marketing techniques. This dichotomy has been recognized in other professions, with the result that legislation regulating the commercial aspects thereof has not been sustained: (citations omitted).

"Additionally, though statutory proscription of advertising for professional services has been upheld, it may be observed that the respective courts were concerned with professions which exclusively involved the rendering of a service rather than the vending of commodities. See Semler v. Oregon State Board of Dental Examiners, supra. The various courts sought to foster a personal relationship predicated upon a confidence in the one rendering the service rather than a relationship based upon price. That rationale seems inapplicable to pharmacy. The pharmacist dispenses a commodity the quality of which is strictly regulated by state statutes . . . ." 225 A. 2d at 737.

In sum, the specific statute at bar bears no relation to the wholly permissible regulation of *professional services* affecting the public health and welfare. Rather, it prohibits advertising of consumer goods sold within the scope of the pharmacist's retail activity. As such, it cannot be constitutionally sanctioned on the particular basis advanced here.

There is no merit in the Board's fourth contention that the advertising of drug prices would subject physicians to pressure by their patients to prescribe larger quantities of drugs than medically indicated to enable the latter to avail themselves of quantity discounts. The Supreme Court of Florida in *Stadnik v. Shell's City, Inc., supra,* provided an appropriate answer to this contention:

" . . . The rule proceeds on the notion that the advertisement of a prescription drug will subject the physicians to some sort of irresistible pressures

that will force them to prescribe drugs for their patients simply on the basis of patient demand and without regard to the physical well-being of the patient. This concept disregards completely the professional and ethical integrity of the medical profession in prescribing remedies for patients. Furthermore, it actually suggests the probability of unethical conduct. In actuality, the rule has more resemblance to an economic regulation prohibiting price competition in the prescription drug business than it does to a regulation guarding the public health." 140 So. 2d at 875.

As we indicated earlier, the sale of prescription drugs is thoroughly regulated in this state. Thus, as correctly observed by both the court below and the Pennsylvania court in *Pastor*, it is the physician, not the consumer, who determines what drugs, if any, are to be prescribed or administered. For these reasons, the argument that the advertising of retail prescription drugs will generate increased consumption or result in a greater demand provides no support for upholding the statute.

Aside from the above arguments, the Board challenges the analysis of the "due process" issue in *Pastor*, the authority which Judge Carter unquestionably found controlling. The thrust of its contention is that the constitutional standard applied by the court in *Pastor* in striking down the Pennsylvania statute is not the same as that followed by either the Supreme Court of the United States or this Court. The Board argues that the Pennsylvania court distinguished between state courts and the Supreme Court in their respective handling of due process arguments in economic regulation cases. Furthermore, the Board maintains, since this type of regulatory legislation would be found constitutional under the reasoning of recent Supreme Court cases, so must the Maryland statute. This is so, it says, because Maryland applies the same rule in testing the police power as does the Supreme Court.

To be sure, the Pennsylvania court did state that:

" . . . [T]he Supreme Court of the United States has 'returned to the original constitutional proposition that courts do not substitute their social and economic beliefs for the judgment of legislative bodies, who are elected to pass laws.' (citations omitted). 'Deference to the legislative judgment' is now the federal watchword. (citations omitted). 'It is enough that there is an evil at hand for correction, and that it might be thought that the particular legislative measure was a rational way to correct it.' Williamson v. Lee Optical of Oklahoma, Inc., 348 U.S. 483, 488, 75 S.Ct. 461, 464, 99 L.Ed. 563 (1955). See also Adams v. Tanner, 244 U.S. 590, 599-600, 37 S.Ct. 662, 665, 666, 61 L.Ed. 1336 (1917) (Brandeis, J., dissenting).

"While this test may mean that in the federal courts the 'due process barrier to substantive legislation as to economic matters has been in effect removed,' the same cannot be said with respect to state courts and state constitutional law. This difference between federal and state constitutional law represents a sound development, one which takes into account the fact that 'state courts may be in a better position to review local economic legislation than the Supreme Court. State courts, since their precedents are not of national authority, may better adapt their decisions to local economic conditions and needs.' " 272 A. 2d at 490.

This trend in the Supreme Court decisions dealing with the Due Process Clause in "economic matters," as distinguished from personal rights, has received much attention from the commentators. McCloskey, *Economic Due Process and the Supreme Court: An Exhumation and Reburial*, 1962 Sup. Ct. Rev. 34, presents a comprehensive review of the subject, as do Stern, *The Problems of Yesteryear — Commerce and Due Process*, 4 Vand. L. Rev. 446 (1951) and 37 Brooklyn L. Rev. 617, 622 (1971). We traced the development of this federal-state distinction in *Brooks v. State Board*, 233 Md. 98, 110-12, 195 A. 2d 728 (1963).

Despite the reference to the federal-state dichotomy in *Pastor*, we disagree with the conclusion drawn from it by the Board that the Pennsylvania test is unlike that of Maryland. The following statements in *Pastor* leave no doubt that both follow the same test:

> "Through all these cases we have been guided by the proposition that 'a law which purports to be an exercise of the police power must not be unreasonable, unduly oppressive or patently beyond the necessities of the case, and the means which it employs must have a *real and substantial relation to the objects sought to be attained.*' . . ." 272 A. 2d 491 (emphasis added).

> \* \* \*

> "Examining each reason in turn, however, we will find that none meet the test set out in [*Gambone v. Commonwealth*, 375 Pa. 547, 101 A. 2d 634 (1954)]: Whether the means employed — the prohibition of retail price advertising of prescription drugs — *bears a 'substantial relation to the objects sought to be obtained.'*" 272 A. 2d at 491-92 (emphasis added).

> \* \* \*

> "We thus find that the prohibition in question bears no substantial relation to any of the objects which . . . were sought to be obtained." 272 A. 2d at 494.

The rule of the Maryland cases is virtually identical. As recently as *Salisbury Beauty Schools v. St. Bd.*, *supra*, where we recited the applicable principles at length, we said:

> " ' . . . Freedom of contract is subject to legislative regulation in the interest of public health, safety, morals or welfare. But such legislation must not be unreasonable, arbitrary, or capricious, and the means selected *must have a real and substantial*

*relation to the object sought to be attained. . . .'"*
268 Md. at 58 (emphasis added).

Thus, we applied this standard there in stating:

> "Although the effect of the prohibition in Art. 43, §
> 537 (a), may be to undertake to limit competition
> between the beauty schools and registered beauty
> shops, the Legislature was free to adopt such an
> economic policy so long as it appeared reasonably
> necessary to protect the public welfare. ... We
> cannot say, to the extent it may 'control prices' or
> affect competition, that the statute is unreasonable
> or that it does not *bear a real and substantial
> relationship to the object sought to be attained. . . ."*
> 268 Md. at 59-60 (emphasis added).

Therefore, it is readily apparent that whatever may be the
current direction taken by the Supreme Court in the area of
economic regulation, as distinguished from the protection of
fundamental rights, Maryland and Pennsylvania adhere to
the more traditional test formulated by the Supreme Court
and enunciated in *Lawton v. Steele*, 152 U. S. 133, 137, 14 S.
Ct. 499, 38 L. Ed. 385 (1894). *See Goldblatt v. Hempstead*,
369 U. S. 590, 594-95, 82 S. Ct. 987, 8 L. Ed. 2d 130 (1962).

We pass then to the determination of whether the "means
selected" here bear "a real and substantial relation to the
object sought to be attained." That they do not is effectively
demonstrated, we think, by what we said earlier in
analyzing the arguments advanced by the Board.
Furthermore, the record reveals the following: The ban on
advertising prescription drug prices imposes a burden on
senior citizens because they are unable to conduct any
investigation, such as by reading advertisements, to learn
the available prices for drugs. Many of these same persons
have a great need for maintenance-type drugs. Apart from
what the record discloses, it is clear that these conditions
also apply to those who have modest or low incomes.[6]

---

6. "Most poor people do not enjoy the mobility of the more affluent

These circumstances are compounded by what now stands as an incontestable fact, namely, that there is a wide disparity in prescription drug prices.[7] It follows from these facts that it would be in the best interests of the public to be informed of prescription drug prices to enable purchasing at the lowest available prices.

Thus, the arguments advanced by the Board demonstrate no "real and substantial relation to the object sought to be attained," by the "means selected." Quite to the contrary, the evidence indicates that continued existence of the statute is inversely related to the public health and welfare. Consequently, we do not hesitate to label it "unreasonable, arbitrary and capricious," and therefore an unconstitutional exercise of the police power. Although the objectives attributed to the statute are, indeed, commendable ones, there is no "substantial relation" between them and the statute. The result is, and we so hold, that subsection (iv) of § 266A (c) (4) violates the Due Process Clause of the Fourteenth Amendment and Art. 23 of the Maryland Declaration of Rights.

Lastly, the Board makes two related points. It contends that the court below paints with too broad a brush when it grants appellees "the unrestricted right to advertise drugs and drug prices, whether they be controlled dangerous substances or other prescription drugs, free from

consumer who has a car and can shop around for the best price. Consequently, the poor have become a captive audience for the dwindling number of merchants in their neighborhoods." RX: Retail Drug Price Competition, A Consumer Study by Congressman Benjamin S. Rosenthal (March, 1973) at 20.

7. "A Junior League of Baltimore survey of 69 city stores found wide variations in prices. The price of one prescription ranged from $1 to $5, another from $2.40 to $6 and a third from $3.77 to $9.50. The Maryland Public Interest Research Group found similar results in its survey of 33 stores. The Junior League survey found that the higher prices prevailed in white, wealthy neighborhoods and, distressingly, in black inner-city neighborhoods and near the Metropolitan Senior Citizens Center. Lower prices prevailed in white working class areas." The Evening Sun, Sept. 13, 1973, at A 14, col. 2.

Another survey of 147 pharmacies in 81 communities in 17 states, including Maryland, conducted in July-August, 1972, disclosed ranges such as $15 to $1.50 for 100 penicillin G 400,000 units and $20 to $2.50 for 100 tetracycline 250 mg., Prescription Drug Pricing, Consumer Federation of America, Sept. 1972, at X.

interference by the [Board]," and further, that "[n]o Court in the United States has gone as far as the lower Court in the instant case, in declaring drug price advertising statutes unconstitutional . . . ." We do not agree with the gloss placed by the Board upon the decision of the lower court. Subsection (iv) does not mention "controlled dangerous substances." Nor do we share the Board's view that the decision reached below, if left intact, ". . . will permit a pharmacist, or a pharmacy, to advertise even the most dangerous drug by description, price or otherwise, without accountability to the Board . . . ." Elsewhere we have stressed the comprehensiveness of the regulatory scheme applicable to pharmacies; thus we are not persuaded that the Board is rendered incapable of effective regulation.

A companion argument advanced by the Board is that the decision reached here will cast doubt on Code (1957, 1971 Repl. Vol.) Art. 27, § 300 (e) (ii).[8] The short answer to this contention, as the trial judge stated, is that "the statute under constitutional attack in the instant case is not Art. 27, § 300 (e) (ii)," which is a *criminal* statute. We note, furthermore, that the statute here proscribes the advertising of "prescriptions, dangerous or nonproprietary drugs," whereas § 300 (e) (ii) restricts the advertising of "any controlled dangerous drug or prescription drug." By definition, as contained in § 300 (a), the term "prescription drugs" does "not mean any controlled dangerous substance," which is defined elsewhere by schedule.

In any event, lest there be any lingering doubts, we are not here concerned with § 300 (e) (ii), and we carefully refrain from expressing any opinion regarding its constitutionality *vel non.* To underscore the limits of our holding, we repeat that we go no further than to declare subsection (iv) of Art. 43, § 266A (c) (4) unconstitutional as a violation of the Due Process Clause of the Fourteenth

---

**8.** "No person shall be permitted to advertise through any media other than a professional or trade publication any controlled dangerous drug or prescription drug by either its 'trade name' or by its generic or formulary name."

Amendment and Art. 23 of the Maryland Declaration of Rights.

> *Order affirmed; appellant to pay costs.*

*Smith, J., dissenting:*

I am of the opinion that the statute is a valid exercise of the police power. Therefore, I would reverse.

As noted in the majority opinion, cases are legion in Maryland holding that the wisdom or expediency of a law adopted in the exercise of the police power of the State is not subject to judicial review. Such statutes will not be held void if there are any considerations relating to the public welfare by which they can be supported. Therefore, the statute carries with it a strong presumption of constitutionality.

The test has been expressed for the Court in a number of different ways, all basically adding up to the same thing. The version of Judge Barnes in *A & H Transp. Inc. v. Baltimore*, 249 Md. 518, 240 A. 2d 601 (1968), was:

> "The courts look, when a legislative action is challenged, to *any* set of circumstances that may justify the action." (Citing cases.) *Id.* at 523, footnote 2. (Emphasis added.)

In *Pitts v. State Bd. of Examiners*, 222 Md. 224, 160 A. 2d 200 (1960), Judge Henderson said:

> "The adequacy of the legislative scheme is for the Legislature to determine, and there is a strong presumption in favor of constitutionality. *Reasonable doubt in its favor is enough to sustain it. Magruder v. Hall of Rec'ds Comm.*, 221 Md. 1, 6, 155 A. 2d 899." *Id.* at 227. (Emphasis added.)

Judge O'Donnell put it yet another way earlier this year in *Salisbury Beauty Schools v. St. Bd.*, 268 Md. 32, 300 A. 2d 367 (1973):

> "If any state of facts reasonably can be conceived

that would sustain the constitutionality of the statute within the exercise of the police power, the existence of that state of facts as a basis for the passage of the law must be assumed." (Citing cases.) *Id.* at 49.

In *Brooks v. State Board*, 233 Md. 98, 111, 195 A. 2d 728 (1963), and *Allied American Co. v. Comm'r*, 219 Md. 607, 616-17, 150 A. 2d 421 (1959), Chief Judge Brune and Judge Hammond, respectively, referred for the Court to *Williamson v. Lee Optical Co.*, 348 U. S. 483, 75 S. Ct. 461, 99 L. Ed. 563 (1955), and the comment there of Mr. Justice Douglas for that Court:

"It is enough that there is an evil at hand for correction, and that it might be thought that the particular legislative measure was a rational way to correct it." *Id.* at 488.

In *Liggett Co. v. Baldridge*, 278 U. S. 105, 49 S. Ct. 57, 73 L. Ed. 204 (1928), the Court held unconstitutional a Pennsylvania statute which restricted ownership of pharmacies or drugstores to registered pharmacists. I find it interesting in the context of this case to note that Mr. Justice Holmes and Mr. Justice Brandeis, two of the more liberal members of the Court at that time, dissented. Mr. Justice Brandeis concurred in the Holmes dissent which said in part:

"The Constitution does not make it a condition of preventive legislation that it should work a perfect cure. It is enough if the questioned act has a manifest tendency to cure or at least to make the evil less. . . .

" . . . I think . . . that the police power as that term has been defined and explained clearly extends to a law like this, whatever I may think of its wisdom, and that the decree should be affirmed." *Id.* at 115.

In *Daniel v. Family Ins. Co.*, 336 U. S. 220, 69 S. Ct. 550, 93 L. Ed. 632, 10 A.L.R.2d 945 (1949), the Court upheld a South

Carolina statute which provided that life insurance companies and their agents might not operate an undertaking business and undertakers might not serve as agents for life insurance companies. A unanimous Court held *Liggett* was not authority for invalidation of the South Carolina act. Against arguments that there was no evil to be corrected by the legislation and that the Court should "call the statute arbitrary and unreasonable," Mr. Justice Murphy said for the Court:

> "Looking through the form of this plea to its essential basis, we cannot fail to recognize it as an argument for invalidity because this Court disagrees with the desirability of the legislation. We rehearse the obvious when we say that our function is thus misconceived. We are not equipped to decide desirability; and a court cannot eliminate measures which do not happen to suit its tastes if it seeks to maintain a democratic system. The forum for the correction of ill-considered legislation is a responsive legislature.

> "We cannot say that South Carolina is not entitled to call the funeral insurance business an evil. Nor can we say that the statute has no relation to the elimination of those evils. There our inquiry must stop." *Id.* at 224.

In *Williamson*, Mr. Justice Douglas said for a unanimous Court:

> "The day is gone when this Court uses the Due Process Clause of the Fourteenth Amendment to strike down state laws, regulatory of business and industrial conditions, because they may be unwise, improvident, or out of harmony with a particular school of thought. See *Nebbia v. New York*, 291 U. S. 502; *West Coast Hotel Co. v. Parrish*, 300 U. S. 379; *Olsen v. Nebraska*, 313 U. S. 236; *Lincoln Union v. Northwestern Co.*, 335 U. S. 525; *Daniel v. Family Ins. Co.*, 336 U. S. 220; *Day-Brite Lighting*,

*Inc. v. Missouri,* 342 U. S. 421. We emphasize again what Chief Justice Waite said in *Munn v. Illinois,* 94 U. S. 113, 134, 'For protection against abuses by legislatures the people must resort to the polls, not to the courts.' " *Id.* at 488.

It is against this background that this statute should be evaluated.

A statute similar to ours was upheld by a three judge court in *Patterson Drug Company v. Kingery,* 305 F. Supp. 821 (W.D. Va. 1969).[1] This case apparently was not appealed to the Supreme Court. Judge Butzner there said for the court:

"A few prescriptions, but nevertheless a significant number, cannot be filled from drugs available in manufactured form, so the medicine must be compounded by the pharmacists. Some pharmacists, probably a minority, systematically monitor prescriptions by family records to avoid allergic reactions or the simultaneous use of antagonistic drugs, of which the patient's doctor may not be aware. Although monitoring is not completely effective because of the mobility of customers and the availability of nonprescription drugs which may be antagonistic, it is a benefit to the public.

"From the evidence we find that dispensing prescription drugs affects the public health, safety and welfare. And we conclude that the state's classification and regulation of pharmacy as a professional practice is not arbitrary or invidious." *Id.* at 824-25.

As is conceded in the majority opinion, another similar statute was upheld against attack on constitutional grounds in *Supermarkets Gen. Corp. v. Sills,* 93 N. J. Super. 326, 225

---

1. It is noted that the Attorney General of Maryland submitted a brief there as amicus curiae.

A. 2d 728 (1966). I regard what Judge Mintz said there as relevant here. He stated:

> "In concluding that pharmacy is a profession, I am not unmindful of the fact that over 90% of the prescriptions dispensed are pre-compounded; that is, the pharmacist's function is to count the tablets called for by the prescription and transfer them from the container furnished by the manufacturer into the bottle ultimately dispensed to the purchaser. As will hereinafter appear, however, the role of the pharmacist goes beyond that of the sale of a commodity. In filling a prescription the pharmacist often aids the physician by informing him of the properties and effects of various drugs. If the prescription calls for a generic compound, he chooses the particular brand to be dispensed. Additionally, he may 'monitor' each prescription as to dosage, and possibly determines whether the prescribed drug may be antagonistic to another previously prescribed for the patient by another physician.
>
> "Since pharmacy is a profession, the practice of which affects the public health and welfare, the Legislature in the exercise of its police power may enact such legislation as it deems appropriate to safeguard the public interest, and ban practices tending to unseemly competition which lower standards of service. *Abelson's, Inc. v. New Jersey State Board of Optometrists*, [5 N. J. 412 (1950)]." *Id.* at 338.

\* \* \*

> "Though the primary responsibility for drug prescription rests with the physician, the pharmacist plays an ancillary but important role in insuring that the proper drug and dosage are provided. Accordingly, the pharmacist is required to maintain records of all prescriptions. *N.J.S.A.*

45:14-15. Thus, if the customer frequents one pharmacy for all of his prescription needs, that pharmacist is in a position to check his records and thereby determine if a prescription is in any way antagonistic or contra-indicated by his previous prescription record. The Legislature may have concluded. that this important function of pharmacists would be impaired if they were permitted to advertise. The Legislature may have determined that 'cut rate,' 'discount' or promotional advertising in any way would encourage the patient to seek the pharmacy offering the drug at the cheapest price. As a result of 'price shopping' the pharmacist presumably would not be in a position to effectively determine, by reference to his prescription records, if a particular drug is antagonistic to one previously prescribed, possibly by another physician.

"It was urged that the patient's records are reviewed by the pharmacist only for the purpose of checking prices on prescriptions previously filled for the customer. Perhaps that may be the practice of many pharmacists, but there may be infrequent instances where a pharmacist does 'monitor' the prescription for the purpose of possibly detecting the prescription of an antagonistic drug. Infrequent as such occasions may be, they may justify the enactment of *chapter* 120. See *Williamson v. Lee Optical of Oklahoma, supra,* 348 U.S., at *p.* 487; 75 S.Ct. 461.

"Plaintiffs argued that no evidence was presented to indicate that a pharmacist who advertises prescription drugs at a discount would in any way have a lesser duty to 'monitor' a prescription. True, the duty to 'monitor' may still exist, but the ability to do so effectively might be impaired if the customer tended to 'shop' for his prescription needs." *Id.* at 341-42.

*See also* Annot., *Drugs — Prohibiting Advertising of Prices* 44 A.L.R.3d 1301 (1972).

There is a similarity, as I see it, between this statute and the numerous statutes prohibiting advertising relative to eyeglasses. This similarity was mentioned in *Supermarkets.* The majority opinion notes that the Maryland Board of Pharmacy also saw a similarity, a similarity that does not seem to be distinguished in that opinion. *See* Annot., *Price Posting — Requiring — Prohibiting* 89 A.L.R.2d 901, 935-949 (1963). The problem of advertising by dental laboratories, likewise related, is treated in Annot., *Prosthetic Dentistry — Regulation* 45 A.L.R.2d 1243, 1251-53 (1956).

In *Williamson* an Oklahoma statute was applicable to opticians, but not to sellers of ready-to-wear glasses. As Mr. Justice Douglas put it, the practical effect of the law was that "no optician [could] fit old glasses into new frames or supply a lens, whether it be a new lens or one to duplicate a lost or broken lens, without a prescription." The district court rebelled at the notion that a State could require a prescription from an optometrist or opthalmologist "to take old lenses and place them in new frames and then fit the completed spectacles to the *face* of the eyeglass wearer." (Emphasis in its opinion, 120 F. Supp. at 135.) It found that through mechanical devices and ordinary skill the optician could take a broken lens or a fragment thereof, measure its power, and reduce it to prescriptive terms. It concluded that this provision of the law arbitrarily interfered with the optician's right to do business. The Supreme Court reversed upon this point.

In *Williamson* the statute also made it unlawful "to solicit the sale of . . . frames, mountings . . . or any other optical appliances." The district court conceded that under *Semler v. Dental Examiners,* 294 U. S. 608, 55 S. Ct. 570, 79 L. Ed. 1086 (1935), regulation of advertising relating to eye examinations by the State was permitted, being "rationally related to the public health and welfare." It held, however, that regulation of the sale of eyeglass frames intruded "into a mercantile field only casually related to the visual care of the public" and restricted "an activity which in no way can

detrimentally affect the people." In reversing upon that point, Mr. Justice Douglas said for the Court:

> "An eyeglass frame, considered in isolation, is only a piece of merchandise. But an eyeglass frame is not used in isolation, as Judge Murrah said in dissent below; it is used with lenses; and lenses, pertaining as they do to the human eye, enter the field of health. Therefore, the legislature might conclude that to regulate one effectively it would have to regulate the other. Or it might conclude that both the sellers of frames and the sellers of lenses were in a business where advertising should be limited or even abolished in the public interest. *Semler v. Dental Examiners, supra.* The advertiser of frames may be using his ads to bring in customers who will buy lenses. If the advertisement of lenses is to be abolished or controlled, the advertising of frames must come under the same restraints; or so the legislature might think. We see no constitutional reason why a State may not treat all who deal with the human eye as members of a profession who should use no merchandising methods for obtaining customers." *Id.* at 490.

*See also Head v. New Mexico Bd. of Exam. in Optometry,* 374 U. S. 424, 83 S. Ct. 1759, 10 L.Ed.2d 983 (1963). A New Mexico statute forbade the advertisement "by any means whatsoever . . . of any prices or terms on eyeglasses, spectacles, lenses, frames or mountings . . . ." It was upheld against the attack of a newspaper and radio station whose areas of service included a portion of the State of Texas. The newspaper and radio station were enjoined from accepting or publishing within New Mexico the advertising of a Texas optometrist found to be in violation of the New Mexico law. The Court rejected their contentions that the statute was an unconstitutional burden on interstate commerce and that it was in a field preempted by the Federal Communications Act.

In *Bedno v. Fast*, 6 Wis. 2d 471, 95 N.W.2d 396 (1959), the court upheld the validity of a statute making it unlawful to advertise any definite or indefinite price or credit terms on eyeglasses or frames. The court said:

> "The language of sec. 153.10, Stats., in no way indicates that proof of fraud is necessary to spell out an offense under its price-advertising prohibition. The practice which the statute is intended to protect the public against is that of filling a prescription to meet the price rather than the needs of the patient. To permit price advertising on the part of those who deal with the human eye, even truthful advertising, is to leave the door open for the unscrupulous practitioner to lure and to defraud unsuspecting members of the public. In [*Ritholz v.*] *Johnson*, [246 Wis. 442, 17 N.W.2d 590 (1945)], this court relied heavily upon *Semler v. Oregon State Board of Dental Examiners* (1934), 148 Or. 50, 34 Pac. (2d) 311, 294 U.S. 608, 55 Sup. Ct. 570, 79 L.Ed. 1086, where the court stated that the question was whether the kind of advertising prohibited afforded the unscrupulous practitioner a means of perpetrating fraud and deception upon his patients. It was there recognized that although there is nothing harmful in itself in merely advertising prices, there could be no doubt that unethical practitioners do resort to price-advertising methods to lure the credulous to their offices for the purpose of fleecing them." *Id.* at 477-78.

The court responded to the attack on the constitutionality of the statute by saying:

> "Plaintiffs' argument that they are merely merchants has no merit. We cannot see that eyeglasses are any more merchandise than dentures. Both are prepared according to the needs of the individual. 'Furnishing glasses as much

affects the public health as does furnishing dentures,' this court said in *Ritholz v. Johnson, supra,* page 453. In fact, it seems to us that a person's health may be more gravely endangered by wearing improper glasses than by wearing improper dentures.

"Articles such as clothing or shoes are merchandise, purchased by the consumer for comfort and warmth. Eyeglasses are worn for correctional purposes. The customer himself knows whether a suit or a pair of shoes fit him and will serve the purposes for which he intends them; and if they do not, he suffers no harm. But he must rely on the word of the optician or optometrist that the glasses sold to him contain the proper correction for his vision; and if the correction is wrong he may very well sustain lasting injury to his eyes. This is clearly a matter of public health." *Id.* at 479.

The fact that the modern drugstore is a retail establishment really has no bearing upon the validity of this statute. Prescription drugs may constitute "consumer goods," as the majority refers to them, but I believe "the man in the street" would not regard them as "consumer goods." Whether they are or are not consumer goods in my opinion is irrelevant, however. It may be, as the majority opinion says, that prescription drugs constitute only about 11% of the sales volume of chain drugstores. I suspect, however, that if one eliminated from that base the department stores, supermarkets, or whatever one wishes to call them that have a prescription counter in one corner, the relationship of prescription drugs to total sales volume would be much higher, but that, too, is irrelevant.[2] What is

---

2. The majority by footnote referred to "American Druggist, May 29, 1972, at 17" as authority for its 11% figure. Page 17 of American Druggist on that date refers to a speech by the president of Kroger Company, a midwest grocery chain said to be the third largest in the country. Kroger is referred to as "the parent company of the 460-unit SupeRx Drug store chain." The reference to sales volume there appearing is, "Twenty-two percent of the chain's volume, he said, comes from Rx business, as compared to the national average of 11% for all chain drug stores." The

relevant is whether there is a constitutionally valid, rational basis upon which the statute in question may be rested.

The majority apparently believes that the effect of advertising will be to educate the public as to which store has the lowest prices. If advertising can so educate the public, then it follows that there should be an increase in business on the part of stores with the lowest prices. Bearing in mind that every given action usually brings a reaction and that self-preservation is one of the first laws of nature, I see one rational basis for the statute set forth in *Supermarkets*. The New Jersey court said:

> "In further relating the statute to the protection of the public health and welfare, it may be observed that discount price advertising may encourage smaller retailers to buy unusually large quantities of drugs in order to take advantage of cheaper prices for such purchases, and thus meet the competition of the larger outlets. As a result, otherwise *potent* drugs may *remain* on the shelf for an extended period of time, during which they may deteriorate and ultimately be sold to the customer. Dr. Friend testified that little is known about the problems of drug deterioration, but that the situation poses a prime concern in the profession. Hence, if the statute at all deters such buying practices, its relation to the public interest is manifest." *Id.* at 342.

The majority states that the ban on advertising prescription drug prices imposes a burden on senior citizens because they are unable to conduct any investigation "such

---

speaker said his chain sold "garden hose and motor oil — just like many other drug stores . . . ." If his figure of 11% for the prescription business of "all chain drug stores" is accurate, then it surely follows that the relationship of prescription business to total sales in non-chain drugstores, the common, ordinary pharmacy that does not sell "garden hose and motor oil," is much higher.

Stores with prescription departments, which stores are a long way from the common conception of a drugstore, were discussed in Giant of Md. v. State's Attorney, 267 Md. 501, 517-18, 298 A. 2d 427 (1973), and Patuxent v. Ades of Lexington, 257 Md. 398, 263 A. 2d 584 (1970).

as by reading advertisements" to learn the available prices for drugs. It apparently believes that by permitting advertising the public will be benefited. The thought that there can be advertising which will provide a *meaningful* basis for comparing prices in my opinion is, to borrow the words of Lord Denman, "a delusion, a mockery and a snare." [3] It certainly would be no exaggeration to say that the prescription department of the average drugstore carries more than a thousand separate items of prescription drugs. To effectively compare prices one would need to know, in addition to the compound, the strength, the manufacturer, and the form of dosage in which the medicine is being prescribed — a lot different and a lot more complicated than comparison shopping for chickens, apples, canned tomatoes, shoes, or even a lady's handbag. Advertising just cannot make available to the public a rational basis for comparison of prices between one store and another. Short of a computer print-out, I fail to see how a *sound* basis for comparison of prices can be found. The General Assembly might well have concluded just that and prohibited advertising for that reason.

It must be remembered that there is nothing to prevent a given store from advertising a drug below its normal selling price in an effort to entice into the store those persons who might have prescriptions for such drugs which they have had filled elsewhere at higher prices — and making up for that reduction by raising other prices. For a substantial period of time it was a known fact in the poultry industry on Delmarva that certain supermarkets, to lure customers into their respective stores, were offering "specials" on chicken at a price often below the cost of production to the processing plant. The General Assembly might well have reached a similar conclusion and decided that drugs necessary for the health of our people should not be used for "bait" advertising. In *Ritholz v. Johnson*, 246 Wis. 442, 17 N.W.2d 590 (1945), the statute under consideration, among other things, made it unlawful to advertise any definite price on

3. O'Connell v. The Queen, 11 Clark and F. 155 (1844).

complete eyeglasses. The court upheld the validity of the statute, reversing a trial court. One portion of its opinion makes interesting reading and indicates my fears are not completely without foundation:

> "We do not have to rest the constitutionality of the statute wholly upon the dentist case, [*Modern S. Dentists v. State Board of D. Examiners*, 216 Wis. 190, 256 N. W. 922 (1934)]. The evidence in this case shows that the advertising used by the plaintiffs actually does operate to defraud the public. The customers of plaintiffs are mostly poor persons. The plaintiffs by their own testimony aim to advertise where their advertisements will reach 'workers, foreigners and negroes' particularly. They use the advertisement as a lure or bait, or as they call it 'an inducement' to draw such persons to their stores. The general nature of their advertising is shown by the photostatic copy of an advertisement printed herewith. Note the following in the photostat: '$12.00 value $3.88;' 'at the low price of only $3.88;' 'get the glasses you need at prices you can afford;' 'no extra cost;' 'FREE;' 'no extra charge.' This on its face is dishonest advertising. It manifestly aims and tends to mislead the public within the rule of *Semler v. Oregon State Board of Dental Examiners, supra,* and *Commonwealth v. Ferris*, 305 Mass. 233, 25 N.E.(2d) 378, and is therefore fraudulent advertising." *Id.* at 448.

All of the cases I have read regard the pharmacist as a professional person. It is true, as the majority states, that much of the business carried on in the average drugstore is ordinary retailing. However, that with which we are here concerned is the professional part of the business. In *Semler* the Court had under consideration an Oregon statute forbidding a number of advertising activities on the part of dentists including advertising prices and "advertising by means of large display, glaring light signs, or containing as a part thereof the representation of a tooth, teeth, bridge work

or any portion of the human head . . . ." The Court said the challenger claimed:

> "that the statements in his advertisements were truthful and were made in good faith; that by these methods he had developed a large and lucrative practice; that through long training and experience he had acquired ability superior to that of the great majority of practicing dentists; that he had been able to standardize office operations, to purchase supplies in large quantities and at relatively low prices, and thus to establish a uniform schedule of charges for the majority of operations; also that he had made contracts for display signs and for advertisements in newspapers, and had entered into other engagements, of which he would be unable to take advantage if the legislation in question were sustained, and, in that event, his business would be destroyed or materially impaired." *Id.* at 610 of 294 U. S.

Mr. Chief Justice Hughes said for the Court:

> "The State court defined the policy of the statute. The court said that while, in itself, there was nothing harmful in merely advertising prices for dental work or in displaying glaring signs illustrating teeth and bridge work, it could not be doubted that practitioners who were not willing to abide by the ethics of their profession often resorted to such advertising methods 'to lure the credulous and ignorant members of the public to their offices for the purpose of fleecing them.' The legislature was aiming at 'bait advertising.' 'Inducing patronage,' said the court, 'by representations of "painless dentistry," "professional superiority," "free examinations," and "guaranteed" dental work' was, as a general rule, 'the practice of the charlatan and the quack to entice the public.'
>
> "We do not doubt the authority of the State to

estimate the baleful effects of such methods and to put a stop to them. The legislature was not dealing with traders in commodities, but with the vital interest of public health, and with a profession treating bodily ills and demanding different standards of conduct from those which are traditional in the competition of the market place. The community is concerned with the maintenance of professional standards which will insure not only competency in individual practitioners, but protection against those who would prey upon a public peculiarly susceptible to imposition through alluring promises of physical relief. And the community is concerned in providing safeguards not only against deception, but against practices which would tend to demoralize the profession by forcing its members into an unseemly rivalry which would enlarge the opportunities of the least scrupulous. What is generally called the 'ethics' of the profession is but the consensus of expert opinion as to the necessity of such standards." *Id.* at 611-12.

It seems to me that the General Assembly might well have concluded that in the operation of the professional portion of a drugstore advertising of prices should be forbidden as one of the "practices which would tend to demoralize the profession by forcing its members into an unseemly rivalry which would enlarge the opportunities of the least scrupulous." [4]

In my judgment there is yet another valid, rational basis for the statute which the General Assembly might have had in mind, *i.e.* "monitoring," mentioned in both *Supermarkets* and *Patterson.* It is not sufficient to say that the physician is better able than the pharmacist to monitor, that this is the

---

**4.** American Druggist, May 29, 1972, at page 17 carries a direct quote from the President of Kroger Company, "parent company of the 460-unit SupeRx Drug store chain," where he said, "It is not proper or ethical to advertise prescription drug prices and we do not favor this."

physician's basic responsibility. We hear much today of the need and necessity for fail-safe mechanisms. Prescription drugs directly affect the health and physical well being of our people. Can we, therefore, correctly label as arbitrary a legislative desire that there be a second possible check against prescription of antagonistic drugs or drugs to which an individual might have an allergic reaction? I think not.

It is true, as said in *Patterson*, that "monitoring is not completely effective because of the mobility of customers and the availability of nonprescription drugs which may be antagonistic." In this day of specialization in the medical field, where an individual may conceivably be under the care of more than one physician at a time without a single physician's being in full charge, a prescribing physician may not necessarily be aware of all medicine being taken by an individual. Approximately a year ago I witnessed monitoring in action. When presented with a prescription, an alert, conscientious pharmacist noted from his record that the patient was allergic to a certain type of drug. He then called the prescribing physician before filling the prescription. Fortunately, in that situation the physician had already taken the known allergy into consideration and was of the opinion that the particular drug would have no adverse effect. Under other circumstances, however, the action of the pharmacist might well have prevented disastrous results. Therefore, I am of the opinion that, as put in *Patterson*, monitoring "is a benefit to the public." Surely this would be a rational basis upon which the action of the General Assembly might have been rested.

We must not lose sight of the fact that ours is the judicial, not the legislative, function. It might well be that as legislators we would not enact a law such as this. We are not legislators, however; we are judges. As I have pointed out, we have said that reasonable doubt in favor of a statute is enough to sustain it and that when a legislative action is challenged the courts look to *any* set of circumstances that might justify the action. As previously mentioned, in *Salisbury Beauty Schools* we said earlier this year:

"If any state of facts reasonably can be conceived

that would sustain the constitutionality of the statute within the exercise of the police power, the existence of that state of facts as a basis for the passage of the law must be assumed." *Id.*, 268 Md. at 49.

I am of the opinion that any one of the hypotheses I have set forth above might have been a basis for the passage of the law and that any one of them would constitute a valid basis for the exercise of the police power. Accordingly, I would reverse the action of the trial judge.